**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| DAVID CARL,<br><br>Plaintiff,<br><br>vs.<br><br>FIRST NATIONAL BANK OF OMAHA,<br><br>Defendant. | Case No.: 2:19-cv-00504-GZS<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Plaintiff, David Carl ("Plaintiff"), hereby moves this Court for summary judgment against Defendant, First National Bank of Omaha ("Defendant" or "FNBO"), under the Telephone Consumer Protection Act ("TCPA"), 28 U.S.C. § 227, *et seq*. The undisputed evidence leaves no genuine issue of material fact that Defendant used its Livevox Voice Portal Dialing System ("Voice Portal"), an automatic telephone dialing system ("ATDS"), to call Plaintiff's cellular telephone seven hundred eight (708) times without his consent, including one hundred and twenty-two (122) calls where Defendant also left an automated message on Plaintiff's voicemail. Each of these calls violated the TCPA. Accordingly, Plaintiff is entitled to judgment against Defendant for no less than $354,000, the minimum under the TCPA, and up to $1,062,000 should this Court find that Defendant's placement of the offending robocalls was willful and with the knowledge that Plaintiff had revoked his consent for such calls. In support therefore, Plaintiff hereby includes the following Memorandum of Law.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

LEGAL STANDARD 5

ARGUMENT .......... 6

I. DEFENDANT PLACED COLLECTION CALLS PLACED USING EQUIPMENT REGULATED BY THE TCPA .......... 6

A. Since 2003, an ATDS has been interpreted to include any *system* that *automatically dials telephone* numbers, regardless of how the numbers were stored or generated .......... 6

B. The D.C. Circuit set aside a portion of the FCC's 2015 Order regarding "capacity" but noted that a device could be an ATDS even if it lacked the present capacity generate numbers randomly or sequentially .......... 7

C. Proper statutory interpretation holds that an ATDS includes devices that automatically dial telephone numbers regardless of whether those numbers are stored in a list or produced with a random or sequential number generator .......... 9

D. Defendant's Voice Portal dialing system is an ATDS which was used to call Plaintiff's cell phone 708 times .......... 13

E. Defendant used an artificial and/or prerecorded voice to call Plaintiff's cell phone one hundred and twenty-two (122) times .......... 14

II. DEFENDANT DID NOT HAVE PLAINTIFF'S EXPRESS CONSENT TO CALL HIS CELLULAR TELEPHONE .......... 14

A. The FCC and Courts Interpreting the TCPA Have Ruled That Permitting Consumers to Revoke Consent By Any Reasonable Means Is Consistent With the Purpose of the TCPA .......... 16

B. This Case is Distinguished from *Reyes* and the *Reyes* Holding Does Not Apply to this First Circuit case .......... 18

i. The Majority of Courts throughout the Country Have Declined to Follow the Reasoning in Reyes....................18

ii. The Consent at Issue in This Matter was Not Contractual and the *Reyes* Court Agreed Consent from a Loan Application is Revocable ....................21

III. DEFENDANT IS LIABLE TO PLAINTIFF FOR AT LEAST $500, AND AS MUCH AS $1500, FOR EACH OF ITS 708 TCPA VIOLATIONS....................23

CONCLUSION....................24

# TABLE OF AUTHORITIES

***CASES***

*ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018)................... 8, 9, 10, 17, 19

*Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768 (11th Cir. 2011) ............................... 23

*Allan v. Pennsylvania Higher Educ. Assistance Agency*, 968 F.3d 567 (6th Cir. 2020) .. 11, 12, 14

*Ammons v. Ally Financial, Inc.*, 326 F.Supp.3d 578, 595 (M.D.Tenn., 2018) ............................ 19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986) ....................................... 6

*Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 207 L. Ed. 2d 784 (2020)1, 6, 12

*Blow v. Bijora, Inc.*, 855 F.3d 793 (7th Cir. 2017) ............................................................. 7

*Breda v. Cellco Partn.*, 934 F.3d 1 (1st Cir. 2019)............................................................ 15, 25

*Duran v. La Boom Disco, Inc.*, 955 F.3d 279 (2d Cir. 2020) .............................................. 11, 13

*Echevvaria v. Diversified Consultants, Inc.*, 2014 U.S. Dist. LEXIS 32136 (S.D.N.Y. Feb. 28, 2014)........................................................................................................................ 23

*Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) .................................................... 13

*Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301 (11th Cir. 2020).......................... 13

*Gonzalez v. HOSOPO Corp.*, 371 F. Supp. 3d 26 (D. Mass. 2019) ............................................ 12

*Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975)................................................................... 5

*King v. Time Warner Cable Inc.*, 894 F.3d 473 (2d Cir. 2018) ......................................... 9, 15, 23

*Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064 (W.D. Wis. 2018).......................................... 9

*Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018)................................. 10, 12, 13

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) ................................. 7

*Penzer v. Transp. Ins. Co.,* 545 F.3d 1303 (11th Cir.2008)........................................................ 23

*Prescott v. Higgins,* 538 F.3d 32 (1st Cir.2008) ................................................................... 5

*Sands v. Ridefilm Corp.*, 212 F.3d 657 (1st Cir. 2000) .......... 6

*See Charvat v. GVN Michigan, Inc.*, 561 F.3d 623 (6th Cir. 2009) .......... 23

*Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270 (N.D. Ill. May 5, 2010) .......... 23

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) .......... 7

*Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922 (1st Cir. 1983) .......... 5

*Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 892 (W.D. Tex. 2001) .......... 23

*Thompson v. Coca–Cola Co.,* 522 F.3d 168 (1st Cir.2008) .......... 6

***STATUTES***

47 U.S.C. § 227(a)(1) .......... 6

47 U.S.C. § 227(b)(1)(A) .......... 14

47 U.S.C. § 227(b)(1)(A)(iii) .......... 6, 12

47 U.S.C. § 227(b)(3)(C) .......... 23

***OTHER AUTHORITIES***

137 Cong. Rec. S16204 (Nov. 7, 1991). .......... 1

***RULES***

Fed. R. Civ. P. 56 .......... 5

***REGULATIONS***

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003). .......... 6, 7

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559 (2008) .......... 7

In the Matter of *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015) .......... 8, 15

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Introduction**

As Justice Kavanaugh recently opined, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2343, 207 L. Ed. 2d 784 (2020). It was in response to this growing disdain that Congress enacted the Telephone Consumer Protection Act ("TCPA"), 28 U.S.C. § 227. Senator Holdings, sponsor of the TCPA, commented that "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. S16204, S16205 (Nov. 7, 1991). Thus, the TCPA was Congress's answer to address Americans' concerns about these harassing robocalls by prohibiting any person or entity from using an automatic telephone dialing system ("ATDS") or an artificial or prerecorded voice to call a cellular telephone number without prior express consent of the called party.

In this matter, Defendant started placing calls to Plaintiff's cell phone in an effort to collect an alleged past due balance on a credit card. Feeling annoyed and harassed by the calls, Plaintiff asked Defendant to stop calling his cell phone. Defendant maintains a policy to treat verbal requests to stop calling as revoking consent and to assent to such requests. However, even though Plaintiff asked Defendant to stop calling his cell phone, Defendant continued to place calls using an ATDS and, at times, an artificial or prerecorded voice. Over the next five and on half months, Defendant used an ATDS to place seven hundred eight (708) collection calls to Plaintiff's cellular telephone, leaving one hundred and twenty-two (122) automated messages on Plaintiff's voicemail. Each of these calls violated the TCPA.

**Statement of Facts**

Mr. Carl ("Plaintiff") obtained a First Bankcard from First National Bank of Omaha ("Defendant") in 2017. From 2017 until February 2019, Mr. Carl made his payments on time. However, in February 2019, Mr. Carl fell behind on his credit card payments and Defendant began to call his cell phone, with phone number ending in 5865. But it wasn't enough for Defendant to simply call Mr. Carl to remind him of his delinquency. Defendant loaded Mr. Carl's cell phone number into its autodialer and proceeded to robocall his cell phone up to six times per day and from four different phone numbers. Feeling harassed and finding the constant barrage of calls to his cell phone to be a burden on his everyday life, Mr. Carl spoke with his attorney about the phone calls. With his counsel's assistance, Mr. Carl asked three of his creditors to stop calling his cell phone. Defendant is the only creditor that continued to call Plaintiff's cell phone.

On March 13, 2019, with the assistance of counsel, Mr. Carl called Defendant at phone number (877) 395-3606. Defendant's agent answered the phone, "First Bankcard, Keandra Thompson speaking..." and the conversation proceeded in the following:

Plaintiff: Yes, hi, I'm returning a call.

Defendant: Uhm, ok. Uhm, can you just hold on for just a second. I'm sorry… Excuse me sir, can you, uh, give me the phone number that we called you from?

Plaintiff: Yup, 207-837-5865.

Defendant: You said, 207-837-5865?

Plaintiff: Yes ma'am.

Defendant: I'm trying to pull up your account and it won't allow me to. Would you, uhm, state me your full social number and I'll be able to pull up your account?

Plaintiff: What's that?

Defendant: I said, would you be able to give me your full social so I can pull up your account because I typed in your, uhm, phone number and it didn't pop up.

Plaintiff: Ok, [Plaintiff's social security number].

Defendant: You said [Plaintiff's social security number]?

Plaintiff: Yes ma'am.

Defendant: That's not popping up either. (Speaking to someone else) Yeah, I pushed enter.

Plaintiff: I keep getting phone calls from you guys and I really wish you would stop calling.

Defendant: Uhm, do you know what number that we're calling?

Plaintiff: Yeah, you are calling my 207-837-5865. It's the only phone number I have.

Defendant: Ok sir, so I am trying to pop up your account, but it won't allow me to. I typed in your phone number and your social. What is your first and last name sir?

Plaintiff: My first name is David. My last name is Carl, C-A-R-L.

Defendant: David Carl, C-A-R-L?

Plaintiff: Yes.

Defendant: Ok, I'm typing it in. Can you hold on for just a second sir? I have a lot of David Carl's in my account. (Speaking to someone else) Yeah, he said we keep calling his number though; he says he keeps getting a lot of calls from us. Yeah.

Defendant: Excuse me, sir?

Plaintiff: Yes?

Defendant: Do you know the exact phone number that we calling? So we can remove your number from our –

Plaintiff: That's the only phone –

Defendant: Because, I typed in your social, your phone number, and, uhm, your name and I don't see nothing on my account for you sir.

Plaintiff: Well, somebody has been calling me from you, from you guys and using that phone number and I really wish you would stop.

Defendant: Ok, but can you just give me your phone number one more time sir and I will put it in our system to, uh, stop calling?

Plaintiff: Ok, 2-0-7. 8-

Defendant: 2-0-7.

Plaintiff: 3-7.

Defendant: 8-3-7.

Plaintiff: 5-8-6-5.

Defendant: Ok sir, so I'm going to put you in our system, so you can be on the do not call list and I'm sorry for your, uh, troubles sir.

Plaintiff: Alright, thank you.

Defendant: Thank you.

However, despite this conversation, and despite Defendant's agent fully understanding Plaintiff's request, the phone calls did not stop. In fact, after this conversation, Defendant proceeded to call Plaintiff's cell phone seven hundred eight (708) times. In one hundred twenty-two (122) of these calls, Defendant left artificial or prerecorded messages. All of these calls were placed by Defendant's Voice Portal Dialing System.

There is no question that all of the calls that Defendant made to Plaintiff's cell phone were placed by Defendant's Livevox Voice Portal Dialing System. All of the calls placed to Plaintiff's cell phone were placed in a predictive dialing mode, and all of the calls placed to Plaintiff's cell phone required no human intervention to dial the phone number. The Voice Portal Dialing System is a predictive dialer which allows Defendant to upload hundreds of thousands of phone numbers

and dial those phone numbers automatically. As is demonstrated in the Voice Portal User Manual, and explained by Plaintiff's expert witness, Randall Snyder, Voice Portal is a predictive dialer. Like all predictive dialers, Defendant is able to establish "campaigns." These campaigns allow Defendant to create calling parameters like: how many times to call a specific phone number in a day, with what frequency, how many rings to allow, when to play prerecorded messages, and countless other options to fine tune the dialer's functions to allow for optimal contact rate. Once a campaign is established, Defendant needs to simply upload a list of phone numbers and turn the dialer on. Voice Portal will then dial as many phone numbers as it deems necessary to ensure that Defendant's agents are connected to delinquent borrowers. Defendant's Voice Portal dialer automatically robocalls the phone numbers uploaded into the software, as in this case, up to six times per day.

## Legal Standard

Pursuant to Federal Rules of Civil Procedure, courts should grant a motion for summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56. "Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983) (quoting Fed. R. Civ. P. 56(c). A party opposing summary judgment must "establish the existence of an issue of fact which is both 'genuine' and 'material.'" *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Prescott v. Higgins,* 538 F.3d 32, 40 (1st Cir.2008) (citing *Thompson v. Coca–*

*Cola Co.,* 522 F.3d 168, 175 (1st Cir.2008)). "[T]o be considered material, a disputed fact must have the potential to 'affect the outcome of the suit under the governing law'". *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)).

## Argument

The Supreme Court noted that "[i]n plain English, the TCPA prohibited almost all robocalls to cell phones." *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2344, 207 L. Ed. 2d 784 (2020); 47 U.S.C. § 227(b)(1)(A)(iii). The undisputable evidence proves that Defendant used an ATDS and an artificial or prerecorded voice to call Plaintiff's cell phone without his consent.

### I. DEFENDANT PLACED COLLECTION CALLS USING EQUIPMENT REGULATED BY THE TCPA

#### A. Since 2003, an ATDS has been interpreted to include any *system* that *automatically dials telephone* numbers, regardless of how the numbers were stored or generated.

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). "It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14092 (2003). Thus the FCC determined in 2003, and reaffirmed separately in 2008, that a predictive dialer is an ATDS. *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. at 14093, ¶ 133 ("[T]he Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."); *In*

*the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 23 F.C.C. Rcd. 559, 566 (2008). at 566, ¶ 12 ("[W]e affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 1043 (9th Cir. 2012) ("The FCC further defined 'automatic telephone dialing system' to include predictive dialers.").

A predictive dialer is "equipment that dials numbers and, when certain computer software is attached, also assists . . . in predicting when [an] agent will be available to take calls." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. at 14091, ¶ 131; *accord Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638-39 (7th Cir. 2012) ("The machine, called a predictive dialer, works autonomously until a human voice comes on the line. If that happens, an employee in Bill Collector's call center will join the call."). "The principal feature of predictive dialing software is a timing function, not number storage or generation." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. at 14091, ¶ 131.

"The [predictive dialer] hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, **or from a database of numbers**." *Id.* at 14091, ¶ 131 (emphasis added); *see also Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017) ("The FCC has now long recognized that 'predictive dialers,' which have 'the capacity to store or produce numbers and dial those numbers at random, in sequential *order, or from a database of numbers,* are autodialers under the TCPA.") (emphasis added).

**B. The D.C. Circuit set aside a portion of the FCC's 2015 Order regarding "capacity" but noted that a device could be an ATDS even if it lacked the present capacity generate numbers randomly or sequentially.**

In 2015, the FCC issued another ruling regarding the TCPA to address whether the term "capacity" as used in the TCPA is limited to a device's current ability or includes the devices latent/potential capacity to function as an ATDS. *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7992 (2015) The FCC declined to adopt such a limitation that limited capacity only to a device's present abilities, finding that such a position would undermine enforcement of the TCPA. *Id*. at 7972-7977. The FCC ruled that the term "capacity" can encompass certain potential abilities, so long as those abilities are not "too attenuated" or merely "theoretical." *Id*. at 7975.

Many regulated entities sought judicial review under the Hobbs Act of the FCC's 2015 Order. On March 16, 2018, the D.C. Circuit issued its decision in *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018), regarding the FCC's 2015 order and expressed concern that if capacity included functions that could be added to the system at a later date, the definition of an ATDS would include smartphones which could download an app to autodial. *ACA Int'l*, 885 F.3d at 697. "If every smartphone qualifies as an ATDS, the statute's restrictions on autodialer calls assume an eye-popping sweep." *Id*. Therefore, the D.C Circuit set aside the FCC's 2015 Order as it pertains to capacity.

Defendant may argue that the D.C, Circuit set aside all FCC orders rather than just the 2015 order that was before the court. However, the D.C. Circuit took care to narrow the reach of its decision to the FCC's 2015 order alone:

> Under the Administrative Procedure Act, we assess whether the [FCC's] challenged actions in its 2015 order were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *** Applying those standards

> to petitioners' four sets of challenges to the [FCC'S] 2015 Declaratory Ruling, we set aside the [FCC's] explanation of which devices qualify as an ATDS[.]

*Id*. at 694-95; *see also Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064 (W.D. Wis. 2018) ("But assuming that Charter is correct and the court of appeals invoked jurisdiction to review the 2003, 2008, and 2012 orders, the court of appeals did not actually review them. Its analysis and holding were limited to the 2015 order: it looked at the ways in which the 2015 order expanded upon prior rulings, and then struck down those expansions as unreasonable.").

While focused on the FCC's treatment of capacity in the 2015 order, "[t]he D.C. Circuit noted that "the role of the phrase, 'using a random or sequential number generator,' has generated substantial questions over the years," which the FCC's 2015 Order failed to conclusively resolve." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 481 (2d Cir. 2018) (quoting *ACA Int'l*, 885 F.3d at 701). To that point, the D.C. Circuit recognized that the FCC's 2015 Order proposed conflicting guidance on the issue—a conflict that did *not* exist in prior FCC orders. *ACA Int'l*, 885 F.3d at 702–03. The FCC declined to recognize one interpretation over the other, but it did state that an ATDS could lack the capacity to generate numbers randomly or sequentially:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). **It might be permissible for the Commission to adopt either interpretation**. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

*ACA Int'l*, 885 F.3d at 702–03 (emphasis added). Indeed the D.C. Circuit was careful to avoid undoing years of well-established law and, in fact, stated that it was certainly permissible for a device to be an ATDS even if it lacked the capacity to generate random or sequential numbers. *Id.*

**C. Proper statutory interpretation holds that an ATDS includes devices that automatically dial telephone numbers regardless of whether those numbers are stored in a list or produced with a random or sequential number generator.**

After the D.C. Circuit issued its ruling in *ACA* Int'l, many TCPA defendants argued that an ATDS must utilize a random or sequential number generator, even though the D.C. Circuit explicitly declined to adopt that interpretation as a requirement. *ACA Int'l*, 885 F.3d at 702–03. The Ninth Circuit Court of Appeals was the first[1] appellate court to address the requirements of an ATDS after *ACA Int'l*. in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018). Considering the language used to define an ATDS in the statute, the Ninth Circuit "conclude[d] that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." *Marks*, 904 F.3d at 1052. To reach this interpretation, the Ninth Circuit court followed proper statutory construction by examining as the purpose of the TCPA and viewing the statute as a whole. *Id*. at 1051-52. The Ninth Circuit noted that the purpose of the TCPA, exceptions of liability for calls that would use a list of telephone numbers, as well as the fact Congress amended the TCPA in 2015, proves that an ATDS includes equipment that dials from a list of numbers. *Id*.

Importantly, the Ninth Circuit did not expand the definition of an ATDS, as Defendant may try to argue. The Ninth Circuit also did not reach in interpretation of an ATDS that would extend to smartphones, noting that the D.C. Circuit had addressed that concern when it limited the functions of an ATDS to its current capacity. *Id*. at 1047. Rather, the Ninth Circuit affirmed an

---

[1] Defendant may argue that the Third Circuit was the first circuit court to address the issue. However, the issue before the Third Circuit was whether the plaintiff presented evidence on the system's capacity to generate random numbers. *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 118 (3d Cir. 2018). The court never addressed whether an ATDS must generate numbers randomly or sequentially, nor does it appear the parties argued that issue.

ATDS definition that's been applied since as far back as 2003. This interpretation—that an ATDS included devices that store telephone numbers and automatically dial those numbers—was also properly found by the Second and Sixth Circuit courts.

In *Duran*, the Second Circuit ruled that "for several reasons" an ATDS does not require a random or sequential generator, but includes any device that automatically dials phone numbers even if the phone numbers are stored in a list. *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 284 (2d Cir. 2020). The *Duran* court reasoned that its interpretation of an ATDS avoids surplusage, because telephone numbers cannot be stored using a number generator, and to require a random or sequential number generator would read "store" out of the statute. *Id*. at 284-285. The Second Circuit also noted that the purpose and structure of the TCPA supports the interpretation that an ATDS includes devices that store telephone numbers and automatically dial those numbers. *Id.* at 285. The Second Circuit also noted that its conclusion of an ATDS follows long-standing FCC guidance, further finding that the 2003 and 2008 remained binding. *Id*. at 286.

Likewise, the Sixth Circuit found "that the structure and context of the autodialer ban support an interpretation of ATDS that would cover stored-number systems. . ." *Allan v. Pennsylvania Higher Educ. Assistance Agency*, 968 F.3d 567, 575 (6th Cir. 2020). To reach this conclusion, the court noted that "it is impossible to draw any reliable conclusion from a plain text reading of the autodialer definition itself and instead rely on the larger context of the autodialer ban" to analyze what functions an ATDS must perform. *Id*. at 579. "In doing so, we join the Second and Ninth Circuits and hold that a stored-number device like the Avaya system here qualifies as an ATDS." *Id*. at 580.

While the First Circuit has yet to address the issue, this Court's sister district court, the District of Massachusetts, has tackled the ATDS definition. In *Gonzalez v. HOSOPO Corporation*,

the court subscribed to the reasoning outlined in *Marks*, and subsequently in *Duran* and *Allan*. Specifically, the court considered "provisions in the TCPA [that] allow [] an ATDS to call selected numbers" such as the prior express consent exception discussed above, and the record of the 2015 amendment to the TCPA by Congress. *Gonzalez v. HOSOPO Corp.*, 371 F. Supp. 3d 26, 33 (D. Mass. 2019). The 2015 amendment by Congress ultimately added an additional exception to the TCPA for calls made "solely to collect a debt owed or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). "In creating such an exception. . .", the *Gonzalez* Court furthers, "Congress must have envisioned that an ATDS at times would be calling numbers from pre-set lists of people who owed a debt to the United States" *Id*. at 33 (citing *Marks*, 904 F.3d at 1052). Also, since Congress did not modify the definition of ATDS, even though the FCC's prior orders at the time interpreted ATDS to include devices that could dial numbers from a stored list, it suggested that Congress approved of such a definition. *Id*. (citing *Marks*, 904 F.3d at 1052). Although the 2015 amendment to the TCPA has since been determined to be unconstitutional[2], the underlying logic of the *Gonzalez and Marks* Courts is still sound. *See also Allan* at 575-576. Thus the *Gonzalez* Court eventually held that in order to be an ATDS, "a device need only have the capacity to do one of the following: either (1) "store ... telephone numbers to be called" and "dial such numbers," *or* (2) "produce telephone numbers to be called, using a random or sequential number generator" and "dial such numbers." *Id*. at 34.

Defendant will likely argue that the Eleventh and Seventh Circuits reached a different conclusion and held that a device must utilize a random or sequential number generator to be an

[2] *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 207 L. Ed. 2d 784 (2020).

ATDS. However, unlike the Second, Sixth and Ninth Circuits which addressed the TCPA's purpose, the Eleventh and Seventh Circuits relied on conventional rules for proper grammar and punctuation to apply to what both courts agree is poor grammar. *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1306 (11th Cir. 2020) ("Clarity, we lament, does not leap off this page"); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020) ("The wording of the provision that we interpret today is enough to make a grammarian throw down her pen"). Both courts admit that its interpretations of an ATDS is flawed. *Glasser*, 948 F.3d at 1307; *Gadelhak*, 950 F.3d at 466. However, the interpretation of an ATDS suggested by Plaintiff in this matter—the same interpretation found by the Second, Sixth, and Ninth Circuits—eliminates the flaws reached under the Eleventh and Seventh Circuit and furthers the TCPA's purpose. *Glasser*, 948 F.3d at 1315 (Martin, J., dissenting) ("I believe Ms. Evans's interpretation should prevail on the grounds that it avoids surplusage, harmonizes the challenged language with other aspects of the TCPA, and aligns with the Ninth Circuit's approach")

**D. Defendant's Voice Portal Dialing System is an ATDS which was used to call Plaintiff's cell phone 708 times.**

Defendant's Voice Portal Dialing System is a predictive dialer. As a predictive dialer, Voice Portal is uploaded with a list of accounts containing phone numbers to call, stores dialing campaigns, and automatically dials the phone numbers associated with those accounts. The testimonies of Randall Snyder and that of Mr. Osborne speak to equipment which can function as an ATDS, with the capacity to load hundreds of thousands of phone numbers via campaigns and call those phone numbers automatically, up to seven times per day and more. This function—to store telephone numbers to be called and to automatically dial such numbers—fits squarely within the definition of an ATDS. *Marks*, 904 F.3d at 1050 (an ATDS is a device with the "capacity to dial stored numbers automatically"); *Duran*, 955 F.3d at 284 (to be an ATDS phone numbers

automatically dialed must be either stored in any way or produced using random or sequential number generator); *Allan*, 968 F.3d at 573 (Defendant's dialing system was an ATDS because it stored numbers to be called and automatically dialed those numbers).

Between March 13, 2019 and August 30, 2019, Defendant used its Voice Portal Dialing System to place 708 collection calls to Plaintiff's cell phone. Each and every call was dialed automatically using Defendant's Voice Portal Dialing System and no manual calls were placed. Therefore, all of Defendant's 708 calls to Plaintiff's cell phone were placed using an ATDS and all 708 calls violated the TCPA.

**E. Defendant used an artificial and/or prerecorded voice to call Plaintiff's cell phone one hundred and twenty-two (122) times.**

In addition to regulating robocalls placed with an ATDS, the TCPA also prohibits robocalls that use an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(A). Defendant's Voice Portal dialing system has the option to leave automatic messages if an answering machine (or voicemail) is detected. When configured to leave automatic messages, Defendant's Voice Portal dialer can utilize "voice talents" which are artificial voices comprising of various languages and accents.

Defendant used its Voice Portal dialer to leave 122 such automatic messages on Plaintiff's cell phone's voicemail after March 13, 2019. As the TCPA also prohibits using an artificial or prerecorded voice, these 122 calls also violated the TCPA.[3]

[3] While Defendant used its Voice Portal dialer, an ATDS, to leave these automatic messages, Claimant does *not* seek double recovery for the voicemail violations.

## II. DEFENDANT DID NOT HAVE PLAINTIFF'S EXPRESS CONSENT TO CALL HIS CELLULAR TELEPHONE.

The First Circuit understands consent to be called with an ATDS or an artificial or prerecorded voice for purposes for the TCPA to be an affirmative defense, which the caller has the burden to prove. *Breda v. Cellco Partn.*, 934 F.3d 1, 4 n.4 (1st Cir. 2019). The FCC and several courts have held that a creditor has prior express consent when a consumer provides his cell phone number, such as on a loan application. However, when a borrower's consent is obtained through a credit card application, the FCC and federal courts find that a borrower has the right to revoke that consent by any reasonable means that conveys that the calls are not wanted and that calls are to stop. *See*, e.g., *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd 7961, 7996 (July 10, 2015) ("consumers may revoke consent in any manner that clearly expresses a desire not to receive further messages, and that callers may not infringe on that ability by designating an exclusive means to revoke"); *King v. Time Warner Cable*, 113 F. Supp. 3d 718 (S.D.N.Y. July 4, 2015) (awarding treble damages under the TCPA after plaintiff told defendant that she did not consent to further robocalls). The FCC emphasized that allowing consumers to revoke consent through any reasonable means furthers the Act's stated goal of protecting consumers:

> **We therefore find the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts**. This gives consent its most appropriate meaning within the consumer-protection goals of the TCPA. By contrast, an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent.

*Id.* at ¶ 56 (emphasis added).

Neither Congress nor the FCC intended to commit consumers to receive unwanted autodialed calls indefinitely merely because the consumer may have consented before the first call

was ever placed. While a consumer may have initially given a caller permission to use an automatic telephone dialing system to call his or his cell phone, that consumer did not consent to be harassed by phone calls which are increased through the use of automatic telephone dialing systems. Once the consumer feels harassed, that consumer is free to revoke the consent that he initially provided through any reasonable means. *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, FCC 15-72, 2015 WL 4387780 at ¶ 55 (adopted June 18, 2015). If a consumer was unable to revoke consent when he feels harassed by telephone calls, then the TCPA would have no purpose. This line of reasoning was upheld, again, by the United States Court of Appeals for the District of Columbia in its consolidated ruling, deciding that "We uphold the [Federal Communications] Commission's approach to revocation of consent, under which a party may revoke his consent through any reasonable means clearly expressing a desire to receive no further messages from the caller." *ACA Int'l v. Fed. Commc'ns Comm'n*, at 2.

The undisputed facts in this matter establish that Plaintiff spoke with one of Defendant's vendors on a line dedicated for First Bankcard credit cards on March 13, 2019 and clearly stated that he wanted the calls to his cell phone to stop. In response, Defendant's vendor informed Plaintiff that his cell phone number would be placed on a do not call list. At no point during the conversation was Plaintiff ever informed, or given any reason to believe, that he needed to take any other action to get Defendant to stop calling his cell phone. The March 13, 2019 conversation effectively revoked any express consent for Defendant to call his cell phone using an ATDS or an artificial or prerecorded voice, as the FCC and courts around the country have found revocation of consent, in a manner such as what occurred in this case, to be the intention of Congress in enacting the TCPA.

**A. The FCC and Courts Interpreting the TCPA Have Ruled That Permitting Consumers to Revoke Consent By Any Reasonable Means Is Consistent With the Purpose of the TCPA.**

"Because the TCPA is a remedial statute, it should be construed to benefit consumers." *Gager*, 727 F.3d at 271 (citing *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d Cir. 2011)). Congress intended the TCPA to prevent automated calls by companies that escaped invasion of privacy and other nuisance statutes. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). "[I]f an actor exceeds the consent provided, the permission granted does not protect him from liability for conduct beyond that which is allowed." *Schweitzer v. Comenity Bank*, 866 F.3d 1273 (11th Cir. 2017).

In *ACA Int'l*, the D.C. Circuit examined procedures for revoking consent, noting that the FCC had been asked to clarify methods of revocation, and had stated that "'a called party may revoke consent at any time and through any reasonable means' – orally or in writing—'that clearly expresses a desire not to receive further message.'" *ACA Intl.*, 885 F.3d 687 at 709 (quoting 30 FCC Rcd. at 7989-90 ¶ 47; at 7996 ¶ 63).

Multiple courts across the country have upheld the protective nature of the TCPA, correctly permitting consumers to revoke consent, even after they had provided consent to be called. *See Currier v. PDL Recovery Grp., LLC*, 2017 U.S. Dist. LEXIS 25240, at *22-25 (E.D. Mich. Feb. 23, 2017); *Schweitzer*, 2017 U.S. App. LEXIS 14769; *Osorio*, 746 F.3d at 1255-56 (citing *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376-77 (4th Cir. 2013)) ("one can infer that Congress intended for the TCPA to incorporate the common-law meaning of consent, including its revocation"); *Gager v. Dell Financial Services*, 727 F.3d 265 (3d Cir. 2013), 270-72 ("[o]ur holding that the TCPA allows consumers to revoke their prior express consent is consistent with the basic common law principle that consent is revocable" and "the legislative history supports our

view that express consent is revocable at any time because the TCPA was intended to protect consumer rights, not restrict them"); *Martinez v. TD Bank USA, N.A.*, 2017 U.S. Dist. LEXIS 101979, at *10 (D.N.J. June 30, 2017) (acknowledging that FCC said that consumers have a right to revoke consent); *Hitchman v. Nat. Enterprise Sys., Inc.*, 2014 U.S. Dist. LEXIS 30623, *2 (S.D. Fla. Mar. 10, 2014); *Munro v. King Broadcasting Co.*, 2013 U.S. Dist. LEXIS 168308, *3 (W.D. Wash. November 26, 2013) ("As numerous other courts have held, the TCPA allows consumers to revoke consent to receive text messages and allows them to bring a private action under the TCPA if the messages do not stop thereafter"); *Beal v. Wyndham Vacation Resorts, Inc.*, 2013 WL 3870282, at *16 (W.D. Wis. June 20, 2013) (consumers can revoke their consent orally*); Adamcik v. Credit Control Services, Inc.*, 832 F. Supp. 2d 744, 753 (W.D. Tex. 2011) ("[o]ral revocation of consent is legally effective under the TCPA"), *Gutierrez v. Barclays Group*, 2011 U.S. Dist. LEXIS 12546, *4 (S.D. Cal. Feb. 9, 2011) ("this Court agrees with plaintiffs that prior express consent may be revoked orally").

**B. This Case is Distinguished from *Reyes* and the *Reyes* Holding Does Not Apply to this First Circuit case.**

Defendant is likely to argue that this Court should apply the holding in *Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 56 (2nd Cir. 2017), that consent may not be unilaterally revoked if consent was given as a bargained-for exchange in forming a bilateral contract between the parties. However, Defendant's reliance on *Reyes* is misplaced as *Reyes* is was based on a different type of contract, the decision in *Reyes* was not followed by D.C. Circuit in *ACA Int'l*, and the facts in *Reyes* are distinguishable from this case as Defendant's own policy is to treat verbal requests as revocation of consent.

**i. The Majority of Courts throughout the Country Have Declined to Follow the Reasoning in Reyes.**

Both Circuit and District courts continue to find a creditor's consent to call a consumer's cellular telephone is freely revocable despite the Second Circuit's ruling in *Reyes. Reyes* is a Second Circuit decision that has primarily been followed only within the Second Circuit. (*See Harris v Navient Sols. LLC*, No. 3:15-cv-564 (RNC) 2018 U.S. Dist. LEXIS 140317 (D. Conn. Aug. 7, 2018). The majority of courts outside of the Second Circuit have declined to follow the reasoning in *Reyes.* Instead, the majority of courts have determined that consent to receive calls via an ATDS is revocable by any reasonable means. *See*, e.g., *ACA Intl.*, 885 F.3d 687 at 709; *Ammons v. Ally Financial, Inc.*, 326 F.Supp.3d 578, 595 (M.D.Tenn., 2018) ("The Court finds the Reyes decision to be highly problematic for multiple reasons").

Although the First Circuit has not made a ruling on revocation of consent, the Ninth, Third and Eleventh Circuits have all declined to follow *Reyes*. The Ninth Circuit's practice of allowing consumers to unilaterally revoke consent was reinforced in *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017). There the court upheld the FCC's ruling that (1) prior consent is revocable and (2) that the Ninth Circuit applies a reasonable standard to review whether a revocation occurred. In its holding, the Court states that the "FCC also has since clarified that consumers may revoke consent in its July 2015 Declaratory Ruling and Order. *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C. Rcd. 7961 (July 10, 2015) (the "2015 Order"). The 2015 Order stressed that consumers "have a right to revoke consent, using any reasonable method including orally or in writing." *Id.* at 7996 ¶ 64. The FCC also specified ways in which a consumer may revoke consent to be called: "by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location, among other possibilities." *Id.*

Further, since the ruling in *Reyes*, numerous federal courts have directly spoken to the issue of consent, and numerous district courts have upheld the ruling that prior express consent to receive ATDS calls under the TCPA can be revoked.

"In 2015, however, the FCC clarified that consumers may revoke their consent in any reasonable manner that clearly expresses [their] desire not to receive further calls." *Herrera v. First Nat'l Bank of Omaha, N.A.*, No. 217CV01136RSWLSKA, 2017 WL 6001718, at *3 (C.D. Cal. Dec. 4, 2017). "[T]he Ninth Circuit has already held that although the TCPA "does not explicitly grant consumers the right to revoke their prior express consent," consumers are still permitted to do so. *Brandt v. Ocwen Loan Servicing, LLC*, No. 117CV00643DADEPG, 2017 WL 5878581, at *4 (E.D. Cal. Nov. 29, 2017). "Consent under the TCPA does not have an expiration date and is considered effective until revoked. However, 'consumers may revoke consent at any time and through any reasonable means,' as long as the revocation 'clearly expresses a desire not to receive further messages'" *Michel v. Credit Prot. Ass'n L.P.*, No. 14-CV-8452, 2017 WL 3620809, at *3 (N.D. Ill. Aug. 23, 2017(internal citations omitted)) (see also *Lanteri v. Credit Prot. Ass'n L.P.*, No. 1:13-CV-1501-WTL-MJD, 2017 WL 3621299, at *4 (S.D. Ind. Aug. 22, 2017) "consumers have a right to revoke consent, using any reasonable method") (See also *Aquilar v. Ocwen Loan Servicing, LLC*, 289 F. Supp. 3d 1000, 1005 (D. Minn. 2018) "consumers may revoke their consent using any reasonable means, including oral or written notice; (See also *Riazi v. Ally Fin., Inc.*, No. 4:17CV1705JCH, 2017 WL 4269791, at *3 (E.D. Mo. Sept. 26, 2017) "even in the absence of an express statutory right, consumers have the right to revoke their consent to receive autodialed calls;" see also *Aviles v. Medicredit, Inc.*, No. 4:16CV01138 ERW, 2017 WL 3128914, at *3 (E.D. Mo. July 24, 2017) (holding "Prior express consent may be revoked 'using any reasonable method including orally or in writing.'").

In fact, the Northern District of Ohio in *Rodriguez* systematically opposed the conclusions reached by the *Reyes* court. First, the Court stated, "*Reyes* [] ignores the analytical distinction between TCPA consent and contractual consent on which *Gager* turns. The Third Circuit dismissed the defendant's "argument that its contractual relationship with *Gager* somehow waives his rights under the TCPA" as "incorrect" precisely because "TCPA-engendered consent...is beyond the scope of [any] contract." *Rodriguez v. Premier Bankcard, LLC*, No. 3:16CV2541, 2018 WL 4184742, at *14 (N.D. Ohio Aug. 31, 2018) (citing *Patterson*, *supra*, 2018 WL 647438 at *5). Second, *Rodriguez* states *Reyes* is contrary to the 2015 FCC ruling. "Given the FCC's disapproval of limitations on the method of revocation, "it is a bridge too far" to conclude that the Agency would sanction [the] elimination of the right altogether. *Id.* (quoting *Ammons v. Ally Fin., Inc.*, No. 3:17-CV-00505, 2018 WL 3134619, at *12 (M.D. Tenn. June 27, 2018)). Finally, the Court stated that *Reyes* is "inconsistent with the purpose of the Act". *Id.* "Allowing the consumer to revoke his consent verbally is "consistent with the government interest articulated in the legislative history of the TCPA. . . On the other hand . . . 'adopt[ing] the prohibition on revocation in *Reyes*...would result in the effective circumvention of the TCPA in the debtor-creditor context'. *Id.* (quoting *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 683 (D. Md. 2017)).

**ii. The Consent at Issue in This Matter was Not Contractual and the *Reyes* Court Agreed Consent from a Loan Application is Revocable.**

The *Reyes* court held that the consent at issue in that matter was part of a bargained-for exchange in contract. *Reyes*, 861 F.3d at 57. The court acknowledged that consent provided in *applications* could be revoked at any time, as was the case in *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) and *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014), but contractual consent could not, unless assented to by the other party. *Id*. at 57-58. The court

found that the consent at issue was part of a bargained-for exchange in contract and not unilaterally revocable. *Id*. at 57.

The consent at issue in *Reyes* was part of an enumerated term of the Motor Vehicle Lease Agreement which was signed by both parties to the contract. The terms in the *Reyes* contract included, but were not limited to, the vehicle to be leased, the agreed upon value of the vehicle, when payments would begin, the number and amount of payments to lease the vehicle (Exhibit H). The *Reyes* court differentiated this type of consent from the consent provided in *Gager* and *Osorio*, which the court acknowledged is revocable. *Reyes*, 861 F.3d at 56-57. "In *Gager* and *Osorio* the plaintiffs provided such voluntary consent to be contacted by furnishing their telephone numbers to businesses in connection with **loan and insurance applications**, respectively." *Id*. at 57 (citations omitted) (emphasis added). Similarly, in *Medley v. Dish Network, LLC*, No. 8:16-CV-2534-T-36TBM, 2018 WL 4092120, at *10 (M.D. Fla. Aug. 27, 2018) the Plaintiff signed a contract with the Defendant which clearly enumerated the terms of the signed contract. The court in *Medley* distinguished the case from that of *Gager*, writing "Notably, the plaintiff in Gager provided his telephone number only on an application, and not in a contract for services. An application is the same category of consent, determined to be revocable, as presented in Gager and *Osorio*.

Subsequent to *Reyes*, other Circuit court's reaffirmed that a consumer can orally revoke consent under the TCPA. In *Schweitzer v. Comenity Bank*, 2017 U.S. App. LEXIS 14769 (11th Cir. Aug. 10, 2017) the court noted "if an actor exceeds the consent provided, the permission granted does not protect him from liability for conduct beyond that which is allowed." *Schweitzer*, 2017 U.S. App. LEXIS 14769, at 7. Consumers who consent to receive calls with an ATDS have not consented to be harassed by that conduct. Not only can a consumer revoke consent under the

TCPA, but he can set parameters for when calls are permitted. *Schweitzer*, 2017 U.S. App. LEXIS 14769.

The consent at issue in this matter is analogous to the consent and revocations considered in *Gager*, *Osorio* and *Schweitzer*. That is, Mr. Carl submitted an application for a credit card. The *Reyes* lease agreement was a contract containing enumerated terms which was signed by both parties to that contract (Exhibit H). The consent in *Gager* and *Osorio* was obtained through applications, which, *Reyes* agrees, does not constitute a contractual agreement and is therefore, revocable.

## III. DEFENDANT IS LIABLE TO PLAINTIFFS FOR AT LEAST $500, AND AS MUCH AS $1500, FOR EACH OF ITS 708 TCPA VIOLATIONS.

"The TCPA is essentially a strict liability statute. . ." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) (citing *Penzer v. Transp. Ins. Co.,* 545 F.3d 1303, 1311 (11th Cir.2008)). A defendant is liable for no less than $500 in damages for each call that it makes in violation of the TCPA. *See Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 631-32 (6th Cir. 2009) ("damages are awardable on a per-call basis"). While there is no discretion to award less than $500 for each violation, there is discretion to award treble damages, or $1500 per violation, "[i]f the court finds that the defendant willfully or knowingly violated" the TCPA. 47 U.S.C. § 227(b)(3)(C); *Adamcik*, 832 F. Supp. 2d at 754 (appeal dismissed Feb. 29, 2012). A finding that a violation is knowing or willful under the TCPA does not require proof of any ill will or bad intent, all that must be shown is that the violator "had reason to know, or should have known, his conduct would violate the statute." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 892, 899 (W.D. Tex. 2001); see also *Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270 *6 (N.D. Ill. May 5, 2010) ("willfully" means that the defendant acted voluntarily, and under its own free will, regardless of whether the defendant knew that it was acting in violation of the statute). Treble

damages are appropriate when a caller continues its robocalls knowing the called party does not consent. *See Echevvaria v. Diversified Consultants, Inc.*, 2014 U.S. Dist. LEXIS 32136 (S.D.N.Y. Feb. 28, 2014) (awarding treble damages to a plaintiff finding that the collector should have known it was using a dialer and should have known it didn't have the plaintiff's consent for the calls it placed to her after she asked the collector to stop); *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 727-28 (S.D.N.Y. July 4, 2015) ("After October 3, 2013, TWC had knowledge through its agent that King did not consent to further robo-calls. Therefore, Defendant's subsequent calls were knowing violations and treble damages are appropriate").

In this matter, Defendant knew that it did not have Plaintiff's express consent to use an ATDS or an artificial or prerecorded voice to call his cell phone after March 13, 2019. Plaintiff spoke with Defendant on March 13, 2019 and instructed it to stop calling his cell phone. Defendant's policy is to treat this type of verbal request to stop calling as a revocation of consent. Despite knowing that Plaintiffs no longer consented to its calls, it willfully used its Voice Portal dialer, an ATDS, to place 708 calls to his cell phone, including 122 calls where it also left a prerecorded message, which is also prohibited by the TCPA. There is no question that Defendant knew these calls were prohibited by the TCPA and, therefore, it willfully and knowingly committed these violations. Accordingly, treble damages are appropriate.

## Conclusion

There is no doubt that the current state of the TCPA is unusually confusing. While the facts in this matter are largely undisputed, their application to the law could result in a number of outcomes. For the reasons stated in the exhaustive briefing above, Plaintiff requests that this honorable Court grant his Motion for Summary Judgment. Plaintiff spoke to an agent of Defendant on March 13, 2019 and requested calls to his cellular telephone stop. He had the right to do so and

his request couldn't have been clearer. Yet despite his request, Defendant continued to place seven hundred and eight (708) calls to Plaintiff's cellular telephone, up to seven times a day, via the use of an ATDS. Additionally, one hundred and twenty-two (122) of those calls involved an artificial and computerized voice. Each and every one of these calls is a violation of the TCPA. Therefore, Plaintiff respectfully requests this honorable Court grant summary judgment in favor of Plaintiff and protect him from the "nuisance and invasion of privacy caused by automated or prerecorded telephone calls". *Breda v. Cellco P'ship*, 934 F.3d at 4.

RESPECTFULLY SUBMITTED,

Dated: November 5, 2020

By:*/s/ James A. Sellers, II*
James A. Sellers, II (*pro hac vice*)
Law Offices of Jeffrey Lohman, P.C.
28544 Old Town Front St., Suite 201
Temecula, CA 92590
T: (657) 363-4699
F: (657) 363-6611
JamesS@jlohman.com

By:*/s/ Jeffrey Lohman*
Jeffrey Lohman (*pro hac vice*)
Law Offices of Jeffrey Lohman, P.C.
28544 Old Town Front St., Suite 201
Temecula, CA 92590
T: (714) 381-5747
JeffL@jlohman.com

By: /s/ Daniel G. Ruggiero
Daniel Goldsmith Ruggiero
The Law Offices of Daniel Ruggiero
275 Grove St., Suite 2-400
Newton, MA 02466
P: (339) 237-0343
E: DRuggieroESQ@gmail.com

*Attorneys for Plaintiff, DAVID CARL*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2020, a true and correct copy of the foregoing Motion for Summary Judgment and corresponding documents were filed using the Court's CM/ECF system, which will notify all attorneys of record.

By:*/s/ James A. Sellers, II*

James A. Sellers, II (*pro hac vice*)
Law Offices of Jeffrey Lohman, P.C.
28544 Old Town Front St., Suite 201
Temecula, CA 92590
T: (657) 363-4699
F: (657) 363-6611
JamesS@jlohman.com