**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| DAVID CARL,<br><br>    Plaintiff,<br><br>vs.<br><br>FIRST NATIONAL BANK OF OMAHA,<br><br>    Defendant. | Case No.: 2:19-cv-00504-GZS<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, David Carl ("Plaintiff"), through his attorneys, hereby responds in opposition to Defendant's, First National Bank of Omaha ("Defendant" or "FNBO"), motion for summary judgment.

**<u>Introduction</u>**

The Telephone Consumer Protection Act ("TCPA") is a consumer protection statute which, relevant to this matter, prohibits "almost all robocalls to cell phones." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2344, 207 L. Ed. 2d 784 (2020). Robocalls are permitted only with the prior express consent of the called party, or if the call is for an emergency purpose. 47 U.S.C. § 227(b)(1)(A). Here, Plaintiff initiated this TCPA action against Defendant after it continued to use an automatic telephone dialing system ("ATDS") to place 708 non-emergency robocalls—calls placed with an ATDS and/or an artificial or prerecorded voice—without his consent.

Defendant argues that Plaintiff could not (or did not) revoke its consent to call his cell phone with an ATDS or an artificial or prerecorded voice, that it did not use an ATDS to call Plaintiff's cell phone, and that it believes Plaintiff lacks standing to bring this TCPA claim for the 708 calls it placed to his cell phone after he asked for the calls to stop. The evidence, however,

1

proves that Plaintiff could revoke consent, and he did when he explicitly asked for the calls to stop, and that Defendant continued to use its LiveVox Voice Portal Dialing System ("Voice Portal"), an ATDS, to call Plaintiff's cell phone 708 times, including 122 calls where Defendant left messages with an artificial and/or prerecorded voice. Further, the evidence proves that Plaintiff suffered recognizable, concrete injury to his privacy rights as a result of Defendant's repeated 708 unwanted robocalls, which the TCPA was intended to protect.

## **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015).

**Argument**

I. **PLAINTIFF REVOKED CONSENT WHEN HE SPOKE WITH DEFENDANT'S AGENT AND CONFIRMED THAT THE CALLS TO PLAINTIFF'S CELL PHONE WOULD STOP.**

There is no dispute that Plaintiff called Defendant's agent and revoked consent. On March 13, 2019, Plaintiff called (877) 395-3606, which is a phone number assigned to Credit Control, one of Defendant's vendors. *See* Plaintiff's Statement of Material Fact ("Plaintiff's SMF"), Doc. No. 41, ¶¶ 9-11; *see also* Defendant's Statement of Material Facts ("Defendant's SMF"), Doc. No. 39, p. 22, ¶¶ 9-11. Defendant's vendor answered the call as "First Bankcard." Plaintiff's SMF, Doc. No. 41, ¶ 15. It is the policy for Credit Control to answer calls to the 3606 telephone number, which is used exclusively for customers of First Bankcard, a division of First National Bank of Omaha, as "First Bankcard." *See* Plaintiff's Statement of Additional Material Facts and Response to Defendant's Statement of Material Facts ("Plaintiff's ASMF"), hereto attached, at ¶ 47.

During the March 13 call, Plaintiff asked Defendant's vendor to stop calling his cell phone. Plaintiff's SMF, Doc. No. 41, ¶15; *see also* Defendant's SMF, Doc. No. 39, p. 24, ¶ 18. Defendant admits that Plaintiff clearly "asked the representative to stop calling his cellular telephone." Defendant's SMF, Doc. No. 39, p. 24, ¶ 18. The representative, who works for one of Defendant's vendors answering a line that is dedicated for First Bankcard customers and answering the call as "First Bankcard," told Plaintiff that **he would be put on a do not call list**, thereby representing that Defendant's calls would stop. Plaintiff's SMF, Doc. No. 41, ¶¶ 12, 15. However, after being informed that the calls would stop, Plaintiff received seven hundred eight (708) calls from Defendant. Plaintiff's SMF, Doc. No. 41, ¶ 26.; Defendant's SMF, Doc. No. 39, p. 25, ¶ 22.

3

### A. *Reyes* Would Prohibit Consumers From Being Able To Stop Harassing Robocalls And, Therefore, Conflicts With The Purpose Behind The TCPA.

The TCPA prohibits robocalls if the called party hasn't provided his/her prior express consent to the party placing the robocalls. 47 U.S.C. § 227(b)(1)(A)(iii). As argued in Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ"), in situations where consumers have provided consent, courts across the country have held that consent can be revoked by any reasonable means, including verbally, in order to stop the robocalls. Plaintiff's MSJ, Doc. No. 40, pp. 21-29. When consent is based in contract, as opposed to gratuitously provided, the contract must provide the consumer with the means to revoke consent, otherwise the consumer can revoke using any reasonable means, including oral revocation. *See Rodriguez v. Premier Bankcard, LLC*, No. 3:16CV2541, 2018 WL 4184742 (N.D. Ohio Aug. 31, 2018).

Much like Defendant in this matter, the defendant in *Rodriguez*, also a creditor placing collection calls, argued that *Reyes* precluded the plaintiff from revoking contractual consent. *Rodriguez*, 2018 WL 4184742, *4. The court rejected the creditor's argument, as well as its reliance on *Reyes*. *Id*., at *10. Importantly, the *Rodriguez* court found that a party cannot waive a right to revoke consent based in a contract, if the contract is silent as to revocation. *Id*., at *11-12.

Agreeing with *Ammons*, the *Rodriguez* court also found *Reyes* to be "highly problematic for multiple reasons" *Id*. at 13 (citing *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 595 (M.D. Tenn. 2018)). One such reason, as found by the *Rodriguez* court, is that "*Reyes* is inconsistent with the purpose of the [TCPA]." *Id*. "[A]dopt[ing] the prohibition on revocation in Reyes...would result in the effective circumvention of the TCPA in the debtor-creditor context." *Id*. (quoting *Ginwright v. Exeter Fin. Corp.*, 280 F.Supp.3d 674, 683 (D. Md. 2017)). Thus, despite a contractual relationship between a consumer-plaintiff and a creditor-defendant, unless the parties agreed to an exclusive means of revocation, the consumer-plaintiff was free to revoke consent by

any reasonable means as held by the Federal Communications Commission ("FCC") and other courts, including *ACA Int'l. Id.*, *see also* Plaintiff's MSJ, Doc. No. 40, pp. 23-27.

In this matter, Defendant claims consent was contractual based on the Cardmember Agreement. Defendant's Motion for Summary Judgment ("Def. Motion"), Doc. No. 39, p. 2. While the Cardmember Agreement states that Defendant "may call or e-mail you (using live operators, automatic dialing devices, or recorded messages)," the agreement makes no reference to how Plaintiff could revoke consent, nor does it claim that consent is irrevocable. *See* Joint Stipulated Record ("Record"), Exhibit T, Doc. No. 33-18, p. 8. Therefore, based on the reasoning provided by the court in *Rodriguez*, the guidance provided by the FCC, and the statutory language of the TCPA, Plaintiff was free to revoke consent using any reasonable means.

There are no magic words required to reasonably revoke consent. Revocation must simply be clearly made by expressing a desire not to be called. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd 7961, 7996 (July 10, 2015) ("consumers may revoke consent in any manner that clearly expresses a desire not to receive further messages, and that callers may not infringe on that ability by designating an exclusive means to revoke"); *Singer v. Las Vegas Athletic Clubs*, 376 F. Supp. 3d 1062, 1074 (D. Nev. 2019) (citing *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017)); *King v. Time Warner Cable*, 113 F. Supp. 3d 718 (S.D.N.Y. July 4, 2015) (awarding treble damages under the TCPA after plaintiff told defendant that she did not consent to further robocalls).

**B.     Defendant's Vendor Assented To Plaintiff's Revocation Of Consent Which Is Valid Revocation Even Under *Reyes*.**

The undisputed facts show that Credit Control is actively contracted by Defendant to service Defendant's collection accounts, represented itself to Plaintiff as Defendant, and assented to Plaintiff's request. It is undisputed that, in response to Plaintiff's request to not receive calls

5

from Defendant, the response of Defendant's vendor was that Plaintiff's cell phone number would be placed on the do not call list.

### i. Credit Control had authority to bind Defendant to Plaintiff's revocation.

"Apparent authority is authority 'which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing.'" *Steelstone Indus., Inc. v. N. Ridge Ltd. P'ship*, 1999 ME 132, ¶ 13, 735 A.2d 980, 983 (Me. 1999). Viewed from a third party's perspective, apparent authority exists when a principal's conduct causes a third person to reasonably believe that the principal agreed that the person purporting to act for him or her could do so. *Id.*; *see also First Nat. Bank of Omaha v. Acceptance Ins. Cos.*, 12 Neb.App. 353, 675 N.W.2d 689 (2004) (citing Restatement (Second) of Agency § 27 (1958)). The vendor that Plaintiff called when he revoked consent had apparent authority to bind Defendant.

The (877) 395-3606 telephone number that was called to revoke consent is used exclusively by Defendant's vendor for servicing customers of First Bankcard, a division of Defendant. *See* Plaintiff's ASMF, at ¶ 44. Plaintiff's revocation call was answered by Defendant's vendor as "First Bankcard," and Defendant trains its vendor, Credit Control, in TCPA compliance. Plaintiff's SMF, Doc. No. 41, ¶ 15; Plaintiffs ASMF at ¶ 49.

### ii. Credit Control assented to Plaintiff's reasonable revocation.

The *Reyes* court recognized that contractual consent could be revoked if assented to. *Reyes*, 861 F.3d at 57. In this matter, Credit Control, which had apparent authority, assented to Plaintiff's revocation. Plaintiff's SMF, Doc. No. 41, ¶¶ 15, 20. However, Defendant claims that Plaintiff's revocation somehow never actually occurred because he spoke with its vendor. This position defies the fundamental agency relationship between Credit Control and Defendant *Supra*. Further, this position ignores the fact that, from Plaintiff's perspective, and because of the authority given

to Credit Control by Defendant, Defendant's agent had the actual authority to speak on Defendant's behalf and consent to Plaintiff's request on behalf of Defendant. Plaintiff's ASMF, at ¶ 44

After Defendant's vendor, Credit Control, claimed she couldn't identify Plaintiff's account, she proceeded to take Plaintiff's request to stop calling. Plaintiff's SMF at ¶ 15. Defendant's vendor never informed Plaintiff that it was a third-party collector, rather than Defendant itself. *Id*. In fact, Defendant's vendor actually represented to Plaintiff that it *was* Defendant. *Id*. ("First Bankcard, Kendra Thompson speaking"). Defendant's vendor also never recommended Plaintiff try to call a different number or find other means to relay the revocation to Defendant. *Id*. Instead, Defendant's vendor informed Plaintiff that the collection calls would stop. *Id*.

Defendant argues that it would have been "entirely unreasonable and unduly burdensome" for its vendor to relay Plaintiff's revocation in order to confirm it was honored. Def. Motion, p. 8. Defendant offers no legal authority to support its position that reasonableness applies to what a caller must do when consent is revoked. In fact, the FCC expressly stated that "**consumers may revoke consent in any manner** that clearly expresses a desire not to receive further messages, and that **callers may not infringe on that ability** by designating an exclusive means to revoke." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd 7961, 7996 (July 10, 2015) (emphasis added). Further, Defendant's position that it would be "entirely unreasonable and unduly burdensome" for its vendor to ensure no further calls occurred is contradicted by its own testimony, as it admits that its vendor simply "could have called First National, possibly." *See* Osborn Dep. Transcript, Doc. No. 33-6; 78:7. There is no explanation offered by Defendant as to how it would be more unreasonable for its vendor, representing itself

7

as Defendant on a line used exclusively for Defendant's customers, to simply "call[] First National," than it would be for Plaintiff to somehow know he was not speaking with Defendant and to retry revoking consent, even though its vendor represented itself as Defendant and informed him that the calls would stop.

From Plaintiff's perspective, as apparent authority must be viewed, his revocation was directed to Defendant and, therefore, was valid. He called a phone number used exclusively for accounts with Defendant, his call was answered "First Bankcard," he was never informed that he may have connected with a third party, or that his request for calls to stop would not be honored. In fact, he was told the opposite. Thus, Plaintiff reasonably revoked consent and, even if *Reyes* applied to this matter, which it doesn't, his request was assented to.

## II. DEFENDANT PLACED COLLECTION CALLS TO PLAINTIFF'S CELL PHONE USING EQUIPMENT REGULATED BY THE TCPA.

The TCPA does not prohibit all calls, but it does prohibit making any call with an ATDS or an artificial or prerecorded voice without the consent of the called party. 47 U.S.C. § 227(b)(1)(A). Defendant asks this Court to accept the ruling by the Eleventh Circuit and to reject the Ninth Circuit's ruling as to what qualifies as an ATDS. However, the Ninth Circuit followed Congress's intent when it interpreted an ATDS to include any system that automatically dials telephone numbers, regardless of whether those telephone numbers were stored in the device or produced by a number generator. This Court should follow the same reasoning.

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). At issue is whether the phrase "using a random or sequential number generator" modifies "store" or "produce" or both. Defendant urges this court to follow the Eleventh Circuit's ruling and find that the phrase modifies both "produce" and "store."

Def. Motion., pp. 11-12. However, the *Glasser* court failed to follow Congress's intention behind the TCPA, instead opting to follow "conventional rules of grammar and punctuation" to interpret what it acknowledges is an unclear definition. *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1306 (11th Cir. 2020) ("Clarity, we lament, does not leap off this page of the U.S. Code").

While attempting to follow "conventional rules of grammar and punctuation," the *Glasser* court admitted "hiccups" exist with its interpretation.[1] First, the *Glasser* court recognized "the oddity of 'stor[ing]' telephone numbers using a number generator." *Glasser*, 948 F.3d at 1307. However, as pointed out by Judge Martin in her dissent, the majority "never explains how numbers are actually stored 'using' a random or sequential number generator." *Id*. at 1314. The majority in *Glasser* also acknowledged that its interpretation of an ATDS "creates another problem, one of superfluity" as it leaves "store" without any purpose in the definition. *Id*. at 1307. Judge Martin again noted in her dissent that "[t]here is no surplusage problem if one reads the statute to say that an autodialer must either (1) store telephone numbers, or (2) produce telephone numbers using a number generator." *Id*. at 1316.

However, the Ninth Circuit's interpretation of an ATDS avoids both problems troubling the *Glasser* court's interpretation. The *Marks* court interpreted an ATDS to mean "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if

---

[1] The Supreme Court has held that courts are to avoid statutory interpretations that would lead to absurd results or surplusage, if alternative interpretations are available. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"); *Duncan v. Walker*, 533 U.S. 167, 174 (2001)( a court's duty is to give effect to every clause and word of a statute to avoid treating statutory terms as surplusage).

the system must be turned on or triggered by a person)[.]" *Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1053 (9th Cir. 2018)*. Thus, under *Marks*, there is no issue with surplusage as "store" applies to lists of phone numbers stored in the ATDS, and "using a random or sequential number generator" applies to phone numbers that are produced by the ATDS. Likewise, "the oddity of 'stor[ing]' telephone numbers using a number generator," is avoided because a "number generator" performs a conventional understanding of "generation" as something that is produced or created.

Additionally, the Ninth circuit in *Marks* analyzed the TCPA as a whole to interpret what types of equipment Congress intended to be covered as an ATDS, which the *Glasser* court neglected to do. *Marks*, 904 F.3d at 1051-53. The Second and Sixth Circuit, for similar reasons as the Ninth Circuit, also found that an ATDS includes devices that store telephone numbers or produces telephone using a random or sequential number generator, rather than attempt to justify an interpretation that telephone numbers are "stored…using a random or sequential number generator." *See Duran v. La Boom Disco, Inc.*, 955 F.3d 279 (2d Cir. 2020); *Allan v. Pennsylvania Higher Educ. Assistance Agency*, 968 F.3d 567 (6th Cir. 2020).[2]

Thus, the reasonable interpretation of an ATDS, one which carries out Congress's intention for the TCPA, is one in which an ATDS incudes devices that store telephone numbers in a list and automatically dials those numbers. *Supra*. The Voice Portal dialer that Defendant used to call Plaintiff's cell phone operates in such a way. *See* Plaintiff's Statement of Material Fact, Doc. No. 41, ¶¶ 31-38. Campaigns are loaded in the Voice Portal dialer for later automatic dialing. *Id*. at ¶ 34. These campaign files contain customers phone numbers to be called by the Voice Portal dialer.

---

[2] As noted in Plaintiff's MSJ, the First Circuit has yet to address the definition of an ATDS. However, in *Gonzales*, the District of Massachusetts followed the Ninth Circuit's reasoning, noting that the text of the TCPA shows Congress intended for an ATDS to include devices that automatically dialed from lists of phone numbers. *Gonzalez v. HOSOPO Corp.*, 371 F. Supp. 3d 26, 33 (D. Mass. 2019).

*Id*. at ¶ 33. The Voice Portal dialer automatically dials those phone numbers. *Id*. at ¶ 36. The Voice Portal dialer is an ATDS. *Supra*.

### III.   RECEIVING UNWANTED ROBOCALLS IS INJURY IN FACT AND THE TYPE OF CONDUCT CONGRESS INTENDED TO BE REGULATED BY THE TCPA

Defendant claims that Plaintiff lacks standing to bring his TCPA claim, erroneously arguing that he has not suffered a concrete injury. This argument is entirely without merit and raised by Defendant merely to disparage Plaintiff and/or his attorneys.

#### A.   The Supreme Court Recognized In *Spokeo* That Congress Can Identify Non-Tangible Injury That Would Otherwise Be Difficult To Recognize.

The United States Supreme Court recently addressed the requisite standing for a plaintiff to raise a claim for violation of a consumer protection statute. *Spokeo, Inc. v. Robins*, 194 L. Ed. 2d 635, 2016 U.S. LEXIS 3046, 136 S. Ct. 1540 (2016) (addressing standing to sue under the FCRA). As recognized by the Court, injury in fact is a constitutional requirement, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Id.* at 643-44. An injury must be both "particularized" and "concrete." *Id*. at 644. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' *Id*. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id*.

The Supreme Court recognized, however, that a concrete injury is not synonymous with a tangible injury. *Id*. at 645 ("In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles"). "[W]e have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete." *Id*. Further commenting:

> This does not mean, however, that the risk of real harm cannot satisfy the requirement of concreteness. *See*, *e.g.*, <u>Clapper v.</u>

11

> *Amnesty Int'l USA*, 568 U. S., 133 S. Ct. 1138, 185 L. Ed. 2d 264. For example, the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure. *See, e.g.*, Restatement (First) of Torts §§569 (libel), 570 (slander per se) (1938). Just as the common law permitted suit in such instances, the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, **a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified**. *See Federal Election Comm'n v. Akins*, 524 U. S. 11, 20-25, 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998) (confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III); *Public Citizen v. Department of Justice*, 491 U. S. 440, 449, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989) (holding that two advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue").

*Id*. at 645-646 (emphasis added).

Addressing the plaintiffs' claim against Spokeo, the Supreme Court recognized that "Congress plainly sought to curb the dissemination of false information" when it adopted the procedures of the FCRA. *Id*. at 646. In order to show that a plaintiff has standing to bring a claim under the FCRA, the Supreme Court remanded the case to the Circuit Court to address whether or not the type of harm that Robins alleged was the type of harm that Congress was trying to protect with the FCRA. *Id*.

    **B.    Plaintiff Suffered Concrete Injury As His Privacy Rights Intended To Be Protected By The TCPA Were Violated By Defendant's Continued And Unwanted Robocalls.**

The position the Supreme Court took in *Spokeo*, that Congress may enact legislation providing plaintiffs with standing in federal court so long as the harm alleged was intended to be prevented by the legislation, is consistent with its prior decision recognizing Congress' intention to protect certain rights satisfies concrete injury for standing to sue under Article III. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114 (U.S. 1982). In *Havens Realty Corp.*,

the Supreme Court held that the deprivation of a right by conduct that Congress intended to "[make] unlawful under" the statute, in that case the Fair Housing Act, satisfied the injury-in-fact requirement for Article III standing. *Havens Realty Corp.*, 455 U.S. at 373-74. "This congressional intention cannot be overlooked in determining whether [plaintiffs] have standing to sue." *Havens Realty Corp.*, 455 U.S. at 373. The "actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" *Havens Realty Corp.*, 455 U.S. at 373 (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197 (1975)).

As the Supreme Court previously found, Congress intended the TCPA to prevent automated calls by companies that escaped invasion of privacy and other nuisance statutes. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). The Supreme Court specifically noted that "'[a]utomated or prerecorded telephone calls' made to private residences, Congress found, were rightly regarded by recipients as 'an invasion of privacy.'" *Mims*, LLC, 132 S. Ct. at 745. Simply stated, and as recognized by the Supreme Court, Congress intended the TCPA to protect consumers' privacy rights by preventing unwanted robocalls.

Defendant acknowledges the many courts that have found unwanted calls was sufficient injury in fact. Def. Motion, pp. 13-14. This Court has also addressed this issue and held that "calls [] violating the TCPA **inherently cause concrete injury** for purposes of standing to pursue a TCPA claim." *Ready v. Synchrony Bank*, No. 2:17-CV-00434-JDL, 2018 WL 1701355, at *4 (D. Me. Apr. 6, 2018) (emphasis added). Despite acknowledging the myriad courts who have found unwanted phone calls is sufficient injury in fact, Defendant asks this Court to reject those courts, as well as this Court's ruling in *Ready*, and instead follow the Eleventh Circuit's ruling in *Salcedo*. However, Defendant's reliance on *Salcedo* is entirely misplaced

The Eleventh Circuit held in *Salcedo* that receipt of one single text message was not sufficient injury under the TCPA. *Salcedo v. Hanna*, 936 F.3d 1162, 1165 (11th Cir. 2019). While *Salcedo* involved a single text message, this claim involves 708 robocalls. Defendant ignores that shortly after the Eleventh Circuit's ruling in *Salcedo*, it addressed Cordoba just a few weeks later.

Subsequent to its holding in *Salcedo*, the Eleventh Circuit held "receipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019). In fact, the Eleventh Circuit distinguished a single text message, as was the issue in *Salcedo*, from multiple unwanted phone calls, as was the issue in *Cordoba* and at issue in this matter:

> This Court's recent decision in *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), that the receipt of a single unsolicited text message does not qualify as an injury in fact does not change our analysis. In *Salcedo*, we focused heavily on the unique features of text messages. Receiving a text message does not occupy the device for any period of time, unlike a fax or a phone call, and it does not create the same intrusion into the privacy of the home like an unwanted residential phone call. *Id*. at 1169–70. **In fact, our Court expressly distinguished receiving a text message from receiving an unwanted phone call**, observing that the plaintiff in *Salcedo* "ha[d] not alleged anything like enjoying dinner at home with his family and having the domestic peace shattered by the ringing of the telephone. ... [His] allegations of a brief, inconsequential annoyance are categorically distinct ...." *Id*. at 1172. Compared to a phone's ring, "[t]he chirp, buzz, or blink of a cell phone receiving a single text message is more akin to walking down a busy sidewalk and having a flyer briefly waived in one's face." *Id*. As we recognized in *Salcedo*, **a phone call intrudes upon the seclusion of the home, fully occupies the recipient's device for a period of time, and demands the recipient's immediate attention. While those injuries might not be significant in the grand scheme of things, <u>they are sufficiently concrete and particularized for Article III standing</u>**. This is enough to establish the injury in fact prong of standing for Cordoba and all of the absent class members who received calls from Telecel.

*Cordoba*, 942 F.3d at 1270 (emphasis added). Thus, contrary to Defendant's argument, the Eleventh Circuit confirmed that unwanted *phone calls* confer standing under the TCPA.

14

Defendant did much more than place a single text message, as was the issue in *Salcedo*, or even 18 phone calls, like in Cordoba where the Eleventh Circuit confirmed standing. Here, Defendant placed 708 unwanted robocalls. Both the Eleventh Circuit and this Court, as well as most courts addressing multiple unwanted phone calls, have found standing exists.

Defendant attempts to argue that Plaintiff's claim falls outside the TCPA's zone of interest because he, argued by Defendant, "permitted the calls" after he revoked consent. Def. Motion., pp. 15-16. Defendant also attempts to bolster its argument by disparaging Plaintiff's attorneys in order to suggest that Plaintiff actually wanted or somehow caused it to call him. This argument is unwarranted and completely devoid of any factual or legal authority.

First, Defendant's suggestion that Plaintiff lacks standing because he logged the calls lacks any legal support.[3] A TCPA plaintiff may monitor a defendant's calls, aware that each call in violation of the TCPA is worth $500-$1500 in statutory damages, and may even be a "professional plaintiff," yet standing still exists. *See*, e.g., *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1196 (M.D. Tenn. 2017) ("[T]his Court disagrees [with *Stoops*]. It may be that… knowing his rights under the TCPA, [the plaintiff] is glad the calls were placed. But allowing that fact, even if true, to negate his right to privacy and seclusion would require the Court to embrace a line of reasoning that would ultimately undermine the rights of most, if not all, TCPA plaintiffs and plaintiffs in similar statutory schemes."); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 784 (N.D.W. Va. 2017) (plaintiffs who recorded these robocalls and then filed suit are

---

[3] Defendant attempts to draw similarities between this matter and *Stoops*. The *Stoops* case, however, is an outlier and inapplicable to the matter before this Court. The plaintiff in *Stoops*, a Pennsylvania resident, purchased 40 or more pre-paid cell phones that had been assigned a Florida area code that would have a higher likelihood that the former user of that number would have defaulted on a loan or credit card and, therefore, would be getting collection calls. *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 799 (W.D. Pa. 2016). She did that because she admittedly *wanted* to receive the calls because she, herself, was in the business of filing TCPA lawsuits. *Id*.

"doing exactly what Congress intended —enforcing the law"); *Tel. Sci. Corp. v. Asset Recovery Sols., LLC*, 2016 U.S. Dist. LEXIS 104234, at *20 (N.D. Ill. Aug. 8, 2016) (while the plaintiff may have done something that increased the probability of injury, "[n]o injury would have occurred absent the phone calls initiated by [the defendant]").

Second, Defendant tries to paint Plaintiff as a professional plaintiff who manufactures TCPA claims through his attorneys. Def. Motion, pp. 17-18. Defendant fails to offer any actual evidence to support that claim. The only purported "evidence" Defendant references to support this claim is that when Plaintiff called to revoke consent, he called the 3606 number, rather than other numbers for Defendant. However, Defendant admits that calling that number, which is used by one of its vendors and exclusively used for customers of Defendant, may not have been intentional but instead a "sloppy mistake by Plaintiff's counsel." Def. Motion, p. 7. While calling one of Defendant's vendors at a phone number used exclusively for Defendant may have been unintended, that does not negate Plaintiff's standing.

Since there is no evidence to support this outlandish claim, Defendant disparages Plaintiff's attorneys by referencing *allegations* made against his attorneys. Def. Motion, p. 17. However, *allegations from another lawsuit* against Plaintiff's attorneys—which are disputed and factually unsupported—are not factual evidence. Even if it were evidence, which it is not, it would be inadmissible as improper character evidence and hearsay. *See* Fed. R. Evid. 404(b) (prohibiting "[e]vidence of a crime, wrong, or other act…to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"); Fed. R. Evid. 802 ("Hearsay is not admissible").

**Conclusion**

Defendant moved for summary judgment by arguing that the 708 calls it placed to Plaintiff's cell phone did not violate the TCPA or, if they did (which they did), that Plaintiff lacks standing under the TCPA. However, both of Defendant's arguments lack factual and legal support. Plaintiff revoked consent for Defendant to place robocalls to his cell phone when he unequivocally stated that he no longer wanted to receive Defendant's robocalls, and he was informed the calls would stop; even contractual consent can be revoked when assented to. Without Plaintiff's consent, Defendant used an ATDS, its Voice Portal dialing system which automatically dials telephone numbers, to place these 708 calls and to leave 122 artificial and/or prerecorded voice messages. Further, consumers, like Plaintiff in this matter, who received unwanted robocalls, have standing under the TCPA, and Defendant has failed to present any evidence, admissible or otherwise, to carry its burden.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter an Order denying Defendant's Motion for Summary Judgment and finding Defendant violated the TCPA with the 708 robocalls it placed to Plaintiff's cell phone without his consent.

|  |  |
|---|---|
| Dated: November 5, 2020 | RESPECTFULLY SUBMITTED,<br><br>By: */s/ James A. Sellers, II*<br>James A. Sellers, II (pro hac vice)<br>Law Offices of Jeffrey Lohman, P.C.<br>28544 Old Town Front St., Suite 201<br>Temecula, CA 92590<br>T: (657) 363-4699<br>F: (657) 363-6611<br>JamesS@jlohman.com<br><br>By: */s/ Jeffrey Lohman*<br>Jeffrey Lohman (pro hac vice)<br>Law Offices of Jeffrey Lohman, P.C.<br>28544 Old Town Front St., Suite 201<br>Temecula, CA 92590<br>T: (714) 381-5747<br>JeffL@jlohman.com<br><br>By: /s/ Daniel G. Ruggiero<br>Daniel Goldsmith Ruggiero<br>The Law Offices of Daniel Ruggiero<br>275 Grove St., Suite 2-400<br>Newton, MA 02466<br>P: (339) 237-0343<br>E: DRuggieroESQ@gmail.com<br><br>*Attorneys for Plaintiff, DAVID CARL* |

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2020, a true and correct copy of the foregoing Motion for Summary Judgment and corresponding documents were filed using the Court's CM/ECF system, which will notify all attorneys of record.

By: */s/ James A. Sellers, II*
James A. Sellers, II (*pro hac vice*)
Law Offices of Jeffrey Lohman, P.C.
28544 Old Town Front St., Suite 201
Temecula, CA 92590
T: (657) 363-4699
F: (657) 363-6611
JamesS@jlohman.com