UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DAVID CARL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket no. 2:19-cv-00504-GZS |
| | ) |
| FIRST NATIONAL BANK OF OMAHA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER ON PENDING CROSS-MOTIONS**

Before the Court are two Cross-Motions: (1) the Motion for Summary Judgment by Defendant First National Bank of Omaha ("FNBO") (ECF No. 39); and (2) the Motion for Summary Judgment by Plaintiff David Carl (ECF No. 40). Having reviewed the Motions and related submissions filed by the parties (ECF Nos. 41–51 & 53–56), the Court GRANTS Defendant's Motion (ECF No. 39) and DENIES Plaintiff's Motion (ECF No. 40).

**I.   STANDARD OF REVIEW**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is 'one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.'" Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). "A fact is 'material' if 'its existence or nonexistence has the potential to change the outcome of the suit.'" Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Borges ex rel.

S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotation marks and ellipsis omitted); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.").  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party."  In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

In addition to the limitations imposed by Federal Rule of Civil Procedure 56, District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue . . . ." D. Me. Loc. R. 56(b).  This local rule requires each statement of material fact to be "followed by

a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with citations to supporting evidence, and in which it may set forth additional facts, again with citation to supporting evidence. D. Me. Loc. R. 56(c). Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f).

The existence of cross-motions for summary judgment does not change the standard for construing the undisputed facts. Rather, the Court is required to "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013). In accordance with these standards, the Court constructs the undisputed material facts from the record in the following section.

## II.  BACKGROUND[1]

In July 2017, David Carl applied for and obtained a "First Bankcard" credit card from FNBO. (Pl. SMF (ECF No. 41), PageID # 1580; Def. Resp. SMF (ECF No. 43), PageID # 1616–

---

[1] To the extent that Defendant incorporated a "motion to strike" in its Reply Statement of Material Facts (ECF No. 50), this motion is DENIED IN PART and GRANTED IN PART. Defendant's request to strike correctly points to some instances in which Plaintiff's initial Response to Defendant's Statement of Material Facts (ECF No. 46) failed to comply with the letter and spirit of District of Maine Local Rule 56. However, Defendant elected to largely restate its 32-paragraph statement of material facts, which it notably improperly attached to its motion paper, as a responsive additional statement of material facts. Compare ECF No. 39, PageID #s 1537–44, with ECF No. 43, PageID #s 1623–29. Given a second bite at the apple, Plaintiff provided responses to Defendant's Additional Statement of Material Fact that resolved many of his earlier failures. See ECF No. 48, PageID #s 1668–70. Thus, in construing the undisputed facts, the Court has disregarded the statements Defendant filed within ECF No. 39, as well as the responses to those statements that Plaintiff filed in ECF No. 46. Instead, the Court has relied on Defendant's duplicative additional statements contained in ECF No. 43, and Plaintiff's responses thereto, as reflected in ECF No. 48.

17.) In applying for this account, Carl provided FNBO with his cellular telephone number. (Def. Resp. SMF, PageID # 1623; Pl. Reply SMF (ECF No. 48), PageID # 1668.)

The terms and conditions of Carl's account with FNBO were set forth in a cardmember agreement. (Id.; see generally Ex. T (ECF No. 33-18).) As relevant here, the agreement contained the following provision:

> We may call . . . you (using live operators, automatic dialing devices, or recorded messages) at home or work[,] and those calls . . . will not be considered unsolicited. If you provide a cell phone number to us, either on the application or to a representative, or if you place a cell phone call to us, you agree that we may contact you (including for collection purposes) at that cell phone number. . . .

(Ex. T, PageID # 1188.) FNBO's internal policies required it to consider an oral request to cease calls as a revocation of prior consent to be called, but this was not explicitly provided for in the agreement. (Pl. SMF, PageID # 1582; Def. Resp. SMF, PageID # 1618.) The agreement also contained the following disclaimer:

> [FNBO's] failure to exercise, or our delay in exercising, any of our rights under the Agreement for any reason will not mean we are unable to exercise those rights later. We may, from time to time on a consistent or inconsistent basis, take (or refrain from taking) certain actions that benefit you but that are not required by this Agreement or applicable law. Any such course of dealing or course of performance shall not be considered to add to our legal obligations to you under this Agreement. We may discontinue any such course of dealing or course of performance at any time without prior written notice.

(Ex. T, PageID # 1187.)[2]

In February 2019, Carl became past due on his account balance. (Pl. SMF, PageID # 1581; Def. Resp. SMF, PageID # 1617.) FNBO then started calling Carl approximately one to six times a day, in order to collect on amounts past due. (Id.) These calls originated from the following four

---

[2] The agreement's choice of law provision indicated federal law and, to the extent state law applied, Nebraska law. Ex. T, PageID # 1188.

telephone numbers: (800) 537-3302, (888) 893-9519, (800) 424-6920, and (888) 810-5673, all of which FNBO owned. (Id.; Def Resp. SMF, PageID # 1626; Pl. Reply SMF, PageID # 1669.)

FNBO utilized a "dialer team" to make daily decisions regarding whom to call, at what number, and whether a message would be left. (Pl. SMF, PageID # 1587; Def. Resp. SMF, PageID # 1622.) FNBO then used a LiveVox Voice Portal Dialing System ("Voice Portal") to place these calls. (Pl. SMF, PageID # 1586; Def. Resp. SMF, PageID # 1621.) The Voice Portal system operated "campaigns," which consisted of files with a list of accounts to call. (Id.) These campaigns were loaded into the Voice Portal system and stored for later automatic dialing. (Pl. SMF, PageID # 1586, Def. Resp. SMF, PageID # 1622.) As relevant here, the Voice Portal system was configured so that, if an automatically dialed call connected, the call would be immediately transferred to an agent. (Id.) The Voice Portal system also could be configured, in the event it connected with an answering machine or voicemail, to automatically (1) leave a message employing an artificial voice, (2) pass the connection to an agent, or (3) leave no message and disconnect. (Pl. SMF, PageID # 1588; Def. Resp. SMF, PageID # 1622.)

After Carl began receiving calls from FNBO, he connected with his present attorneys and provided them with the four numbers from which FNBO had been calling, as well as correspondence that included contact telephone numbers for FNBO. (Def. Resp. SMF, PageID # 1624; Pl. Reply SMF, PageID # 1668.) On or about March 13, 2019, Carl, with the assistance of his attorneys, called (877) 395-3606 ("x3606").[3] (Def. Resp. SMF, PageID #s 1624–25; Pl. Reply SMF, PageID # 1668.) Carl then had the following conversation:

    Representative:    First Bankcard, Keandra Thompson speaking.
    Plaintiff:    Yes, hi, I'm returning a call.

---

[3] According to Carl, it was his attorneys who dialed the x3606 number, and he has "no idea" why they chose that number. Ex. E (ECF No. 33-5), PageID # 182. FNBO did not circulate the x3606 number to its customers or publish this number. Def. Ex. 1 (ECF No. 39-1), PageID # 1547.

5

| | |
|---|---|
| Representative: | Uhm, ok. Uhm, can you just hold on for just a second. I'm sorry… Excuse me sir, can you, uh, give me the phone number that we called you from? |
| Plaintiff: | Yup, [redacted]-5865. |
| Representative: | You said, [redacted]-5865? |
| Plaintiff: | Yes ma'am. |
| Representative: | I'm trying to pull up your account and it won't allow me to. Would you, uhm, state me your full social number and I'll be able to pull up your account? |
| Plaintiff: | What's that? |
| Representative: | I said, would you be able to give me your full social so I can pull up your account because I typed in your, uhm, phone number and it didn't pop up. |
| Plaintiff: | Ok, [Plaintiff's social security number]. |
| Representative: | You said [Plaintiff's social security number]? |
| Plaintiff: | Yes ma'am. |
| Representative: | That's not popping up either. (Speaking to someone else) Yeah, I pushed enter. |
| Plaintiff: | I keep getting phone calls from you guys and I really wish you would stop calling. |
| Representative: | Uhm, do you know what number that we're calling? |
| Plaintiff: | Yeah, you are calling my [redacted]-5865. It's the only phone number I have. |
| Representative: | Ok sir, so I am trying to pop up your account, but it won't allow me to. I typed in your phone number and your social. What is your first and last name sir? |
| Plaintiff: | My first name is David. My last name is Carl, C-A-R-L. |
| Representative: | David Carl, C-A-R-L? |
| Plaintiff: | Yes. |
| Representative: | Ok, I'm typing it in. Can you hold on for just a second sir? I have a lot of David Carl's in my account. (Speaking to someone else) Yeah, he said we keep calling his number though; he says he keeps getting a lot of calls from us. Yeah. |
| Representative: | Excuse me, sir? |
| Plaintiff: | Yes? |
| Representative: | Do you know the exact phone number that we calling? So we can remove your number from our – |

6

| | |
|---|---|
| Plaintiff: | That's the only phone – |
| Representative: | Because, I typed in your social, your phone number, and, uhm, your name and I don't see nothing on my account for you sir. |
| Plaintiff: | Well, somebody has been calling me from you, from you guys and using that phone number and I really wish you would stop. |
| Representative: | Ok, but can you just give me your phone number one more time sir and I will put it in our system to, uh, stop calling? |
| Plaintiff: | Ok, [First four digits of phone number]. |
| Representative: | [First three digits of phone number]. |
| Plaintiff: | [Fifth and sixth digits of phone number]. |
| Representative: | [Fourth, fifth, and sixth digits of phone number]. |
| Plaintiff: | 5-8-6-5. |
| Representative: | Ok sir, so I'm going to put you in our system, so you can be on the do not call list and I'm sorry for your, uh, troubles sir. |
| Plaintiff: | Alright, thank you. |
| Representative: | Thank you. |
| | [End of call] |

(Ex. Z (ECF No. 33-24), PageID #s 1482–83.)

Unbeknownst to Carl, Thompson was not employed by FNBO. Rather, she was employed by Credit Control LLC. Credit Control is an independent company which services accounts that have been assigned to it by creditors. (Def. Resp. SMF, PageID # 1625; Pl. Reply SMF, PageID # 1668.) Credit Control had contracted with FNBO "to provide staffing, premises, equipment, supplies, management and such other items or services as may be necessary in order to perform the collection services on behalf of FNBO . . . with respect to certain past due credit card accounts."[4] (Ex J. (ECF No. 34-1), PageID # 1490.) It owned and exclusively used the x3606

---

[4] FNBO provided TCPA compliance training to Credit Control representatives, as part of this contractual relationship. Pl. Resp. SMF (ECF No. 46), PageID #s 1651–52; Def. Reply SMF (ECF No. 50), PageID # 1679.

7

number for these purposes. (Pl. Resp. SMF (ECF No. 46), PageID #s 1651–52; Def. Reply SMF (ECF No. 50), PageID # 1679.)

Relevantly, Carl's account was not among those FNBO assigned to Credit Control; as a result, Credit Control had no record of his account. (Def. Resp. SMF, PageID # 1625; Pl. Reply SMF, PageID # 1668.) Likewise, Carl had never received a call from the x3606 number. (Def. Resp. SMF, PageID # 1628; Pl. Reply SMF, PageID # 1670.)

Although Credit Control generally refers callers for whom it lacks records to FNBO, Thompson did not refer Carl or subsequently contact FNBO about Carl's circumstances. (Ex. D (ECF No. 33-4), PageID #s 167–68; Pl. SMF, PageID # 1584; Def. Resp. SMF, PageID # 1619.) Rather, following his conversation with Thompson, Carl continued to receive calls from FNBO. (Def. Resp. SMF, PageID #s 1627–28; Pl. Reply SMF, PageID #s 1669–70.) Acting on his attorneys' advice, Carl never answered any of these calls, which eventually totaled more than 700 over a roughly six-month period. (Id.; see also Exs. L & M (ECF Nos. 33-11 & 33-12).) Carl found the more than 700 calls to be "annoying" and his "boss started getting a little aggravated with [him] about [them]" as well. (Ex. E (ECF No. 33-5), PageID # 183; Def. Resp. SMF, PageID # 1628; Pl. Resp. SMF, PageID # 1654.) Of these calls, at least 93 appear to have resulted in FNBO leaving a voice message in which it used an artificial or prerecorded voice.[5] (See Ex. L (ECF No. 33-11) & Ex. F (ECF No. 33-6), PageID # 227.)

---

[5] While Plaintiff asserts that Defendant made 122 calls using an artificial and/or prerecorded voice following his March 2019 call to Credit Control, reviewing the record in the light most favorable to Plaintiffs, the Court finds that the call logs and testimony deciphering those logs appear to identify only 93 such calls. Compare Pl. SMF, PageID # 1588, with Ex. L (ECF No. 33-11) & Ex. F (ECF No. 33-6), PageID # 227 (explaining that calls designated as "AUTOV" and "LMM" would have resulted in a prerecorded message).

### III. DISCUSSION

Plaintiff sets forth two causes of action in his First Amended Complaint: (1) negligent violations of the Telephone Consumer Protection Act ("TCPA"), in violation of 47 U.S.C. § 227(b)(3)(B); and (2) knowing and/or willful violations of the TCPA, in violation of 47 U.S.C. § 227(b)(3)(C). (Am. Compl. (ECF No. 12), PageID #s 43–45.)

#### A. The TCPA

As relevant to this case, the TCPA prohibits "mak[ing] any call (other than a call made . . . with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

The TCPA provides for a private right of action under 47 U.S.C. § 227(b)(3). This section imposes strict liability on violators, allowing claimants to recover either their actual monetary losses or $500 in damages for each violation, whichever is greater. See 47 U.S.C. § 227(b)(3)(B). Additionally, upon a finding that the violator acted willfully or knowingly, the court may, in its discretion, increase the damage award up to an award of treble damages. 47 U.S.C. § 227(b)(3); see also Breda v. Cellco P'ship, 934 F.3d 1, 5 (1st Cir. 2019) ("The TCPA is a strict liability statute, but provides for treble damages in the case of 'willful[] or knowing[]' violations[.]" (internal citation omitted)). "[B]ecause the TCPA is a consumer protection statute, [the Court] must interpret it broadly in favor of consumers," Breda, 934 F.3d at 10, but for this "remedial rule of statutory interpretation to apply, the statute must contain an actual ambiguity to construe in the consumer's favor," Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51, 58 (2d Cir. 2017).

#### B. Standing

Before turning to the merits, the Court first must address Defendant's challenge to Plaintiff's standing to bring this action. See Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir.

2006) ("[C]hallenges [to standing] must be addressed first . . . if they call into question a federal court's Article III power to hear the case."); see also O'Brien v. Town of Bellingham, 943 F.3d 514, 529 (1st Cir. 2019) (Subject matter jurisdiction "can be raised at any time during the pendency of litigation."). Defendant's challenges to Plaintiff's standing can be divided into two categories: constitutional and statutory. The Court first considers the constitutional challenge, which arises under Article III.

1. **Article III Standing**

The Constitution empowers Article III courts to decide "Cases" or "Controversies." U.S. Const. art. III, § 2. This constitutional phrase has long been understood "to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." Carney v. Adams, 141 S. Ct. 493, 498 (2020). The doctrine of standing implements this requirement by imposing three key requirements on plaintiffs: "(1) an injury in fact which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) that the injury is 'fairly traceable to the challenged action,' and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.'" Massachusetts v. United States Dep't of Health and Hum. Servs., 923 F.3d 209, 222 (1st Cir. 2019) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). "The plaintiff bears the burden of establishing these elements and must plead sufficient factual matter to plausibly demonstrate standing to bring the action." Perez-Kudzma v. United States, 940 F.3d 142, 145 (1st Cir. 2019) (internal citations and quotation marks omitted). These requirements "apply with equal force in every case brought in federal court and to each and every claim a plaintiff asserts." Amrhein v. eClinicalWorks, LLC, 954 F.3d 328, 333 (1st Cir. 2020) (cleaned up).

The Supreme Court has noted that injury in fact is the "foremost of standing's three elements [and] . . . a constitutional requirement[.]" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547

(2016) (internal quotation marks omitted). Due to its constitutional dimension, "Congress cannot erase [the injury-in-fact requirement] by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Id. at 1547–48; see also Thole v. U.S. Bank N.A., 140 S. Ct. 1615, 1620 (2020) ("This Court has rejected the argument that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." (internal quotation marks omitted)). Nonetheless, Congress can still "raise to the status of legally cognizable injuries certain harms that might otherwise have been insufficient at common law." Amrhein, 954 F.3d at 331 (quoting Katz v. Pershing, LLC, 672 F.3d 64, 75 (1st Cir. 2012)). To summarize, "even Congress can't spin a 'bare procedural violation, divorced from any concrete harm' into an 'injury-in-fact,'" but it can "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." Id. (quoting Spokeo, 136 S. Ct. at 1549).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist," id., yet "'[c]oncrete' injuries embrace not only tangible harms — like a picked pocket or a broken leg — but also intangible ones, like the suppression of free speech or religious exercise, or [t]he invasion of a common-law right (including a right conferred by contract) actionable without wallet injury," Amrhein, 954 F.3d at 330–31 (cleaned up).

Here, Defendant asserts that Plaintiff's injuries are insufficiently "concrete" and his allegations that the calls were annoying are not linked "to any specific call with any detail

whatsoever."[6]  (Def. Mot (ECF No. 39) PageID #s 1529–32.)  Although the First Circuit has not yet directly addressed this issue,[7] § 227(b)(3) claims have been held sufficiently concrete by nearly every other circuit.  See, e.g., Gadelhak v. AT&T Servs., 950 F.3d 458, 462–63 (7th Cir. 2020) (Barrett, J.) (concluding receipt of five text messages constituted concrete injury, observing similarity to intrusion upon seclusion tort); Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1270 (11th Cir. 2019) ("The receipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing."); Melito v. Experian Mktg. Sols., Inc., 923 F.3d 85, 93 (2d Cir. 2019) (holding receipt of text messages sufficiently concrete, noting similarity to privacy and nuisance torts).[8]  Likewise, within the First Circuit, other district courts have found standing to bring a TCPA claim based on injuries similar to Plaintiff's asserted injury here.  See Katz v. Liberty Power Corp., LLC, No. 1:18-cv-10506-ADB, 2019 U.S. Dist. LEXIS 162793, at *35 (D. Mass. Sep. 24, 2019) ("[A] mere technical violation of the TCPA is, by itself, a concrete injury sufficient to confer standing.") (quoting Gibbs v. SolarCity Corp., 239 F. Supp. 3d 391, 395 (D. Mass. 2017)).

Against this massed authority, Defendant offers a single decision: Salcedo v. Hanna, 936 F.3d 1162 (11th Cir. 2019).  In this case, the Eleventh Circuit held that the receipt of a lone unsolicited text message was insufficiently concrete to support standing.  See Salcedo, 936 F.3d

---

[6] Defendant does not suggest that the calls at issue are not fairly traceable to Defendant, nor that the TCPA provides a potential means of redress; accordingly, the Court focuses solely on the injury-in-fact element.

[7] Notably, in Breda, the First Circuit addressed the merits of a § 227(b)(3) claim without raising any standing concerns. 934 F.3d at 1 (reversing and remanding § 227(b)(3) action for further merits review).  In doing so, the Circuit spoke about the types of harm the TCPA seeks to prevent.  See id. at 10–11 ("[C]alls to [plaintiff's] smartphone, transmitted via cellular networks, posed the same type of *nuisance and invasion of privacy* as do calls transmitted via telephone service lacking a VoIP component." (emphasis added)).

[8] See also Golan v. FreeEats.com, Inc., 930 F.3d 950, 959 (8th Cir. 2019) (concluding receipt of two messages on answering machine was sufficiently concrete, noting similarly to nuisance tort); Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1042–43 (9th Cir. 2017) (noting similarity to nuisance and privacy torts as well as TCPA congressional findings); Susinno v. Work Out World Inc., 862 F.3d 346 (3d Cir. 2017) (holding receipt of single prerecorded call to be sufficiently concrete injury, noting similarity to intrusion upon seclusion tort).

at 1173.  However, less than two years later, the Eleventh Circuit has already made it exceptionally clear that Salcedo is a narrow decision.  First, in Cordoba, the Circuit clarified that the receipt of more than one call was sufficiently concrete.  942 F.3d at 1270.  More recently, in Trichell v. Midland Credit Mgmt., the Circuit clarified that the fact Salcedo involved unwanted text messages set it apart from cases involving unwanted telephone calls.  See 964 F.3d 990, 998–99 (11th Cir. 2020) ("Although the statute has been understood to apply to both telephone calls and text messages, the TCPA's statutory findings highlight the burden imposed by unwanted calls but say nothing about unwanted texts.  In part, this Court relied on those findings in holding that the receipt of unwanted phone calls is a concrete injury, but the receipt of a single unwanted text message is not." (internal citations omitted)).  For both of these reasons, Salcedo can be readily distinguished.

Defendant also cites Hochendoner v. Genzyme Corp., a non-TCPA case that turned on the particularity aspect of injury in fact rather than concreteness.  823 F.3d 724, 731 (1st Cir. 2016).  Relying on Hochendoner, Defendant contends that Plaintiff "fails to link his purported annoyance to any specific call with any detail whatsoever."  (Def. Mot, PageID # 1532.)  However, given that the placement of each violating call is already sufficiently concrete in itself, Plaintiff need not have done more.  See, e.g., Katz, 2019 U.S. Dist. LEXIS 162793, at *35.

 2. **Statutory Standing**

"Statutory standing is a horse of a different hue."  United States v. Catala, 870 F.3d 6, 10 (1st Cir. 2017).  Here, instead of gauging the limits of its own authority, the Court asks itself "whether the statute [at issue] grants the plaintiff the cause of action that he asserts."  Bank of Am. Corp. v. City of Miami, 137 S. Ct. 1296, 1302 (2017).  In answering this question, the Court "presume[s] that a statute ordinarily provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked."  Id. (internal quotation marks omitted).  "Whether a plaintiff comes within 'the zone of interests' is an issue that requires [courts]

13

to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014) (cleaned up). The Court does "not ask whether in [its] judgment Congress *should* have authorized [the plaintiff's] suit, but whether Congress in fact did so." Id. at 128. The test "is not meant to be especially demanding." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012). And, "[u]nlike Article III standing . . . the existence of statutory standing is not a prerequisite to a court's power to adjudicate a case." See Catala, 870 F.3d at 10.

Defendant asserts that "Plaintiff does not fall within the 'zone of interests' protected by the TCPA" because he "purposefully chose to permit FNBO's 706 calls to continue without ever once answering a single call and telling FNBO to stop, all at the direction of [his] counsel." (Def. Mot. (ECF No. 39), PageID #s 1534–35; Def. Response (ECF No. 42), PageID # 1612.) In the Court's view, the factual premise of this argument is so intermingled with the merits that resolving the case under the guise of statutory jurisdiction at the summary judgment stage would be inefficient at best and confusing at worst. See Catala, 870 F.3d at 10 ("Thus, an inquiring court may opt, in the interest of efficiency, to forgo an inquiry into statutory standing and reject a claim on the merits."); see also Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 44 (1st Cir. 2020) ("Arguments concerning the absence of statutory standing, unlike arguments concerning the absence of constitutional standing, do not address a court's subject matter jurisdiction but, rather, address the merits of the plaintiff's claims."). Thus, the Court declines to dismiss on statutory standing grounds and proceeds to consider the merits.[9]

---

[9] Nonetheless, the Court notes that the record does establish that Plaintiff maintained the cellular phone in question for purposes other than to simply generate TCPA claims. This finding alone is likely sufficient to bring him within the zone of statutory standing for a TCPA claim. See Katz, 2019 U.S. Dist. LEXIS 162793, at *30 ("[T]he issue of

14

### C. Merits

"[T]he elements of a TCPA claim are: (1) the defendant used an automatic dialing system or an artificial or prerecorded voice, (2) to call a telephone number assigned to a cellular telephone service . . . ." Breda, 934 F.3d at 4; see also 47 U.S.C. § 227(b)(1)(A)(iii). To achieve treble damages, a plaintiff must also show that the violations were willful or knowing. See 47 U.S.C. § 227(b)(3).

In this case, there is no genuine dispute as to the second element: FNBO called Plaintiff's cell phone repeatedly. But, there is a two-prong dispute regarding the first element; namely (1) whether Defendant used an automatic dialing system ("ATDS") to call Plaintiff's cellular phone and (2) whether Defendant used an artificial or prerecorded voice. Given the wording of the statute, if Plaintiff has put forward sufficient evidence on either the use of an ATDS or an artificial or recorded voice, his claim is trialworthy.

Simply put, the Court has already determined that the record—viewed in the light most favorable to Plaintiff—establishes that FNBO placed at least 93 calls to Carl that resulted in an artificial or prerecorded voice message after March 13, 2019. There remains, in the Court's view, a number of factual disputes regarding the other 600-plus calls, including whether all or some of these calls were placed using an ATDS.[10] However, those disputes need not and cannot be resolved via summary judgment.

---

[plaintiff's] standing boils down to whether he maintained the number that [defendant's] agents called for any purpose other than attracting telemarketing calls to support his TCPA lawsuits."); cf. Stoops v. Wells Fargo Bank, N.A., 197 F. Supp. 3d 782, 803–06 (W.D. Pa. 2016) (holding that plaintiff who had "purchased at least thirty-five cell phones and cell phone numbers with prepaid minutes for the purpose of filing lawsuits under the [TCPA]" lacked statutory standing).

[10] The TCPA defines an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator; and . . . to dial such numbers." 47 U.S.C. § 227(a)(1). After the pending cross-motions were placed under advisement, the Supreme Court issued its decision in Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021), which announced: "To qualify as an [ATDS], a device must have the capacity either

Having concluded that Plaintiff has trialworthy evidence on the basic elements of his TCPA claims, the Court must turn to the issue of Carl's prior express consent and his attempt to revoke that consent. See Breda, 934 F.3d at 4 n.4 ("[L]ack of [prior express] consent is not an element of the called party's claim"; rather, "consent [is] an affirmative defense, which the caller has the burden to prove.") At the outset, Plaintiff concedes that "the 'terms and conditions of Plaintiff's Account with FNBO set forth in the Cardmember Agreement' provided [Defendant] with his initial consent," but Plaintiff maintains he reasonably revoked that consent during his March 13, 2019 call. See Pl. Reply (ECF No. 47), PageID # 1662 (internal citation omitted).

### 1. Revocation of Prior Express Consent under the TCPA

The Federal Communications Commission ("FCC") is charged by statute with "prescrib[ing] regulations to implement the requirements of" the TCPA. 47 U.S.C. § 227(b)(2). In furtherance of this charge, the FCC has stated that, despite the absence of any reference to revocation in the text of the statute, "[c]onsumers have a right to revoke consent, using any reasonable method including orally or in writing." [11] In re Rules & Regulations Implementing the TCP Act of 1991 et al. ("2015 Ruling"), 30 FCC Rcd 7961, 7996 (2015). In assessing whether a method was reasonable, the FCC instructed to look "to the totality of the facts and circumstances

---

to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." Id. at 1167. Viewing the record in the light most favorable to Plaintiff, there is a trialworthy question as to whether the Voice Portal system had the capacity to "store a telephone number using a random or sequential generator." Id. However, it is less clear that the "campaigns" FNBO loaded onto its Voice Portal system involved the actual *use* of a random or sequential generator. Nonetheless, the Court acknowledges, as Plaintiff has argued in his supplemental briefing, that Duguid suggested that an ATDS could potentially fall under TCPA if it "use[s] a random number generator to determine the order in which to pick phone numbers from a preproduced list. [and] then store[s] those numbers to be dialed at a later time." Duguid, 141 S. Ct. at 1172 n.7. While this description may encompass Defendant's Voice Portal system, the issue is not amenable to summary judgment on the current record.

[11] In the 2015 Ruling, the question of revocation was posed to the Commission in a petition concerning "situations where a consumer voluntarily has provided a wireless telephone number to a caller, such as by giving the number to the caller without instructing the caller of any limits that the consumer is placing on his consent to receive robocalls at that number or by including the number on a credit application." 2015 Ruling, 30 FCC Rcd at 7993 n.216.

surrounding that specific situation, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request for revocation to the caller in that circumstance, and whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens." Id. at 7996 n.233. The FCC further instructed that "callers may not abridge a consumer's right to revoke consent using any reasonable method," and "consumers may revoke consent in any manner that clearly expresses a desire not to receive further messages, and that callers may not infringe on that ability by designating an exclusive means to revoke." Id. at 7996. Here, the parties initially disagree on whether consent was revocable under the circumstances of this case.[12]

### 2. Plaintiff's Consent was Not Unilaterally Revocable

Relying principally on two circuit decisions—Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51 (2d Cir. 2017), and Medley v. Dish Network, LLC, 958 F.3d 1063 (11th Cir. 2020)—Defendant contends that, the 2015 Ruling notwithstanding, "the TCPA and applicable law do not allow for the unilateral revocation of consent given in a bargained-for contract." (Def. Mot., PageID # 1526.)

In Reyes, the plaintiff provided his cellular phone number in an automotive lease application and was subsequently issued a lease by the defendant containing an express provision of consent to be contacted at that number via ATDS or the use of prerecorded or artificial voices. 861 F.3d at 53–54. After falling behind on payments and receiving calls from the defendant, Reyes attempted to unilaterally revoke his consent to be called. Id. When the calls continued, he sued. The Second Circuit concluded that "the TCPA does not permit a party who agrees to be contacted

---

[12] The Court assumes without deciding that deference is owed to the 2015 Ruling. See Breda, 934 F.3d at 13 n.20 (assuming a footnote in 2015 Ruling "was binding on the district court") (citing PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055–56 (2019) (describing "preliminary sets of questions" that must be answered before determining whether an FCC ruling is binding on a district court)).

as part of a bargained-for exchange" (as opposed to "gratuitously" or voluntarily) "to unilaterally revoke that consent." Id. at 56. The Circuit observed that it "was well-established at the time that Congress drafted the TCPA that consent becomes irrevocable when it is integrated into a binding contract," and found "no indication in the statute's text that Congress intended to deviate from this common-law principle in its use of the word 'consent'" in the TCPA. Id. at 58. Accordingly, the Second Circuit held that the plaintiff's consent to be contacted could not be unilaterally revoked. Id. at 57–58.

In so holding, the Circuit distinguished earlier decisions of the Third and Eleventh Circuits, in which the plaintiffs had provided their numbers to the defendants as parts of applications for a line of credit and insurance, respectively, because in those cases consent had been provided gratuitously rather than as part of a bargained for exchange. Id. at 56–58 (citing Gager v. Dell Fin. Servs., LLC, 727 F.3d 265 (3d Cir. 2013) & Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242 (11th Cir. 2014)). The Circuit also asserted that the 2015 Ruling did not contemplate limitations on revocation imposed as part of a bargained-for exchange, as it explicitly relied on the rationales of Gager and Osorio.[13] Id. at 56–57. The Eleventh Circuit subsequently followed the Second Circuit's approach in Medley, holding that a consumer who had fallen behind on payments could not unilaterally revoke consent that was expressly provided for as part of a satellite television agreement. See 958 F.3d at 1069–71.

---

[13] Plaintiff asserts that Reyes also "recognized that contractual consent could be revoked if assented to," seeking perhaps a means to sustain the claim even if the Court otherwise embraced the Reyes position on revocation. Pl. Opp., PageID # 1639 (citing Reyes, 861 F.3d at 57). However, this, too, does not lead to an availing line of argument. Under the terms of the cardmember agreement, any decision by Defendant to "take (or refrain from taking) certain actions that benefit[ted] [Plaintiff] but that are not required by th[e] Agreement or applicable law" would not bind it moving forward, nor would it be deemed to add to Defendant's legal obligations. Ex. T, PageID # 1187. Accordingly, even assuming that Thompson was empowered to assent in Defendant's stead during the March 13th call, absent a showing that Defendant was legally required to permit revocation, any such assent would still be a nonbinding act.

Notwithstanding the holdings of Reyes and Medley, Plaintiff asserts that "the Ninth, Third and Eleventh Circuits have all declined to follow Reyes," citing Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037 (9th Cir. 2017), in support. (Pl. Mot., PageID # 1572.)  The Court notes, however, that Van Patten both pre-dated Reyes and was not a case where consent to be called was expressly made part of the parties' bargained for exchange, readily distinguishing the decision. The Court assumes Plaintiff's mention of the Third Circuit was likely a reference to Gager, already discussed above.  As to the Eleventh Circuit, Plaintiff's assertion is plainly irreconcilable with Medley.  See Lucoff v. Navient Sol., LLC, 981 F.3d 1299, 1303 n.7 (11th Cir. 2020) (explaining Medley followed Reyes).  Plaintiff also directs the Court's attention to several district court decisions critical of Reyes from outside the First Circuit.[14]  (Pl. Mot., PageID #s 1573–74.)

Ultimately, the Court is persuaded by the reasoning of Reyes and Medley.  This case does not involve calls placed after a called party who had gratuitously provided consent then revoked consent, as was the case in Gager, Osorio, and Van Patten.[15]  Rather, Plaintiff gave consent as part of a bargained-for-exchange and now seeks to unilaterally overthrow basic principles of contract law to access statutory damages.  See, e.g., Medley, 958 F.3d at 1071 ("Permitting [plaintiff] to unilaterally revoke a mutually-agreed-upon term in a contract would run counter to black-letter contract law in effect at the time Congress enacted the TCPA."); Restat. 2d of Contracts, § 287 cmt. a (Am. Law Inst. 1981) (requiring "assent by the other party" before a proposed alteration to

---

[14] See, e.g., Rodriguez v. Premier Bankcard, LLC, No. 3:16-cv-02541, 2018 U.S. Dist. LEXIS 149225, at *33–34 (N.D. Ohio Aug. 31, 2018) (concluding that where a contract is silent as to alternative revocation procedures, the 2015 Ruling's allowance of revocation by any reasonable method controls); Ginwright v. Exeter Fin. Corp., 280 F. Supp. 3d 674, 683 (D. Md. 2017) ("[P]rohibition on later revocation of consent arising from a boilerplate consent provision . . . would be inconsistent with the FCC's ruling[.]").

[15] Granted, Plaintiff may have initially provided consent through his application, in a way that resembled these cases. However, from that point, this case diverges in the direction of Reyes; as Plaintiff concedes, his initial consent was subsequently cemented as a part of the cardholder agreement.  See Pl. Reply (ECF No. 47), PageID # 1662.

a contract becomes valid). Therefore, the Court holds that as a matter of law Plaintiff could not have unilaterally revoked his prior consent to be called during the March 13th call. As a result, the Court concludes Defendant is entitled to summary judgment on both of Plaintiff's TCPA claims.[16]

## IV.  CONCLUSION

For the reasons just given, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 39) and DENIES Plaintiff's Motion for Summary Judgment (ECF No. 40).

SO ORDERED.

/s/ George Z. Singal  
United States District Judge

Dated this 15th day of June, 2021.

---

[16] The Court acknowledges that the parties have also raised arguments regarding whether Plaintiff's March 13th call should be deemed a reasonable means of revocation. Given the Court's holding, the Court does not reach these arguments. However, on the current record, the issue of whether Plaintiff's call to Credit Control could be considered a reasonable means of revocation would involve genuinely disputed issues of apparent agency that the Court would deem trialworthy. See Restat. 3d of Agency, § 2.03 cmt. d. ("It is usually a question for the trier of fact whether a reasonable person in the position of a third party would believe that an agent had the authority or the right to do a particular act.")